# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### Case No. 5:22-cv-46

| | | |
|---|---|---|
| MADELINE LORAINE PASZEK-LOWMAN as Administrator of the Estate of Ashley Hurl Stevens, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **COMPLAINT** (Jury Trial Demanded) |
| CALDWELL COUNTY, ALAN C. JONES, in his official capacity as Sheriff of Caldwell County, TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, VICKY WILLIAMS, in her individual capacity, LEON GENWRIGHT, in his individual capacity, DRAKE BRADLEY, in his individual capacity, _____ as Administrator of the Estate of Robert H. Parsons, in his individual capacity, BRYAN DAME, in his individual capacity, SANDRA LAWS, in her individual capacity, ELISHA PERRY, in her individual capacity, BRANDI ELLER, in her individual capacity, INSTITUTIONAL MEDICAL SERVICES, PLLC, JOHN HENRY PILAND, III, MD, and ELIZABETH B. BEAM, RN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

NOW COMES Plaintiff, complaining of Defendants, and alleges and says as follows:

## INTRODUCTION

1.      On the evening of Monday, April 20, 2020, Ashley Hurl Stevens, age 42, snorted and ingested an unknown amount of methamphetamine near his mother's home in Lenoir, NC. Mr. Stevens became severely intoxicated from the methamphetamine. He was hallucinating, moving constantly, talking incessantly and unintelligibly, and acting abnormally.

2.      Around 11:30 p.m., Mr. Stevens was arrested by the Lenoir Police Department while agitated and "totally out of it" in a neighbor's yard. He was charged with four misdemeanor offenses, given a $1,500 secured bond, and taken to the Caldwell County Detention Center in Lenoir, NC.

3.      At 12:24 a.m. on Tuesday, April 21, 2020, Mr. Stevens was brought into the booking room at the Caldwell County Detention Center. He displayed obvious signs of severe methamphetamine intoxication, including agitation, psychosis, aggression, and intense mood swings. Mr. Stevens needed immediate medical care and attention.

4.      Despite his serious medical needs, Mr. Stevens was booked and admitted by Sergeant Vicky Williams and Corporal Leon Genwright to the Caldwell County Detention Center. During the booking process, the nightshift detention officers handcuffed him, took him to the floor in his underwear, punched him twice in the face, pepper-sprayed him in the eyes, and forcibly restrained him in a restraint chair with leg shackles and a spit mask over his face.[1]

_____

[1] While Mr. Stevens was in the restraint chair, straps were secured around his shoulders, waist, wrists, and ankles.

5.     Sergeant Williams and Corporal Genwright, the admitting officers, did not complete the mandatory Preliminary Health Screening Form for Mr. Stevens or the Officer's Statement of Providing Assistance Form, did not contact the medical contractor, Institutional Medical Services, PLLC (IMS), Caldwell County EMS, or any other health care providers, and did not obtain any medical treatment for him.[2] The detention officers should have contacted Caldwell County EMS to transport Mr. Stevens to the Emergency Room at Caldwell Memorial Hospital, which is located three miles away, instead of admitting him to the Detention Center.

6.     Upon admission, the detention officers confined Mr. Stevens in a restraint chair with a spit mask, naked except for underwear, in Holding Cell 203 for "Detoxification." He was left in the restraint chair in Cell 203 for over 11 hours from 12:56 a.m. until 12:15 p.m. on April 21, 2020. Mr. Stevens did not consume any fluids, eat any food, or sleep while he was in Cell 203. He did not receive any medical treatment or monitoring for his severe drug intoxication.

7.     At 12:15 p.m. on April 21, the detention officers moved Mr. Stevens across the hall to Holding Cell 206, removed him from the restraint chair, and left him on the floor. He was confined naked in Cell 206 for nearly 20 hours for continuing "Detoxification." During his confinement, Mr. Stevens had obvious signs and symptoms of a methamphetamine overdose and his condition worsened. He consumed

---

[2] Institutional Medical Services, PLLC did not have medical staff present at the Detention Center during the night shift, although the Medical Director, Dr. John Henry Piland, III, was required to be available 24 hours per day for consultation with the detention officers regarding medical care for inmates.

an insufficient amount of water, did not eat any food, did not sleep, and did not receive any medical treatment or monitoring.

8.    The IMS nurse, Elizabeth B. Beam, RN, briefly saw Mr. Stevens on several occasions between 8:42 a.m. and 2:16 p.m. on April 21, 2020 and observed that he was severely intoxicated on methamphetamine, moving and talking constantly, sweating profusely, agitated, delusional, and hallucinating.[3] Despite his obvious need for medical treatment, Nurse Beam did not assess his condition, prepare a plan of care, take his vitals, monitor his fluid intake and output, complete a health screening, contact the IMS Medical Director Dr. Piland, Caldwell County EMS, or any other health care provider, or obtain any medical treatment for him.

9.    At or around 1:20 a.m., on Wednesday, April 22, 2020, Sergeant Williams determined that Mr. Stevens had an emergency medical need after Mr. Stevens was screaming hysterically and bleeding throughout the cell from an injury to his rectum or scrotum. She called Dr. Piland at his home "to see what we could do for Inmate Stevens" and "told him what was going on with Inmate Stevens."

10.    Although it was clear that Mr. Stevens was experiencing a medical emergency, Dr. Piland did not examine him, review his medical records, confer with Nurse Beam, refer him for emergency medical services, or provide any medical treatment or care. Instead, Dr. Piland told Sergeant Williams that Mr. Stevens would be fine until the nursing staff arrived in the morning around 8:00 a.m.

_____

[3] Nurse Beam entered Cell 203 with detention officers and a med-tech while Mr. Stevens was in the restraint chair with spit mask. She only observed Mr. Stevens in Cell 206 through the cell door window.

4

11. At 7:57 a.m. on Wednesday, April 22, 2020, Caldwell County detention officers, at the direction of the Jail Administrator, dragged Mr. Stevens out of Cell 206 and placed him in a restraint chair. Mr. Stevens was covered in feces, urine, and blood, his skin was yellow, he was sweating profusely, his breathing was shallow, he had contusions and abrasions throughout his body, arms, legs, genitals, and head, and he had been yelling for hours in a delusional state while mutilating his genitals. He was severely dehydrated, his kidneys were failing, and he was close to death.

12. At 8:15 a.m. on April 22, 2020, Mr. Stevens went into cardiac arrest near the medical and booking rooms at the Detention Center. He never regained consciousness before he was pronounced dead an hour later at Caldwell Memorial Hospital. Mr. Stevens died from complications of dehydration due to methamphetamine toxicity.

13. Plaintiff, as the Administrator of the Estate of Ashley Hurl Stevens, brings this civil action, pursuant to 42 U.S.C. § 1983, against (a) the individual Defendants for deliberate indifference to the serious medical needs of Mr. Stevens in violation of his substantive due process rights under the Fourteenth Amendment, and (b) Defendants Caldwell County, Sheriff Jones, and Institutional Medical Services, PLLC for their respective policies and/or customs of deliberate indifference to the serious medical needs of inmates, like Ashley Stevens, with severe drug intoxication.

14. Plaintiff also brings claims under North Carolina law, including: (a) an official bond action, under N.C. Gen. Stat. § 58-76-5 against Defendants Sheriff Jones and Travelers Casualty and Surety Company of America, (b) a medical malpractice

5

action against Defendants Institutional Medical Services, Nurse Beam, and Dr. Piland, and (c) a corporate negligence and gross negligence action against Defendant Institutional Medical Services.

15. Plaintiff seeks to recover compensatory damages from Defendants for Mr. Stevens' personal injuries and wrongful death. Plaintiff also seeks to recover punitive damages from the individual Defendants (excluding the Estate of Robert H. Parsons) and Institutional Medical Services under federal law, and punitive damages from Defendants Institutional Medical Services, Dr. Piland, and Nurse Beam under state law.

## JURISDICTION AND VENUE

16. Plaintiff, as Administrator of the Estate of Ashley Hurl Stevens, brings this civil action under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law which deprived Mr. Stevens of his due process rights as a pretrial detainee to be free from deliberate indifference to his serious medical needs under the Fourteenth Amendment to the United States Constitution.

17. Plaintiff's action arises under the Constitution and laws of the United States.

18. The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 1343(a)(4).

19. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Western District of North Carolina because all of the events giving rise to this action occurred in the Western District.

21.     The Statesville Division is the proper division for this case in the Western District of North Carolina.

22.     This is a wrongful death action under N.C. Gen. Stat. § 28A-18-2 to recover damages for Mr. Stevens' wrongful death.

23.     This is also a survival action under N.C. Gen. Stat. § 28A-18-1 to recover damages for Mr. Stevens' personal injuries.

## PARTIES

**A.     Plaintiff**

24.     Plaintiff Madeline Loraine Paszek-Lowman is a resident of Corpus Christi, Texas, where her husband is currently stationed in the U.S. Coast Guard. She is 24 years old.

25.     Plaintiff is the Administrator of the Estate of Ashley Hurl Stevens. Plaintiff was duly appointed Administrator of the Estate by the Clerk of Superior Court in Caldwell County file no. 20-E-607.

26.     Plaintiff is the daughter of the late Ashley Hurl Stevens ("Ashley Stevens" or "Mr. Stevens").

27.     Ashley Stevens was born in 1977. He was 42 years old when he died in Caldwell County on April 22, 2020.

7

28. Mr. Stevens' sole heirs at law are his two daughters: Madeline Loraine Paszek-Lowman and Myra Paszek-Stevens, age 22. Mr. Stevens was not married at the time of his death.

**B.      Caldwell County, Sheriff Jones, and Travelers**

29. Defendant Caldwell County is a county in North Carolina organized and existing under N.C. Gen. Stat. § 153A-10, and it has all of the corporate powers set forth in N.C. Gen. Stat. § 153A-11, including the power to be sued.

30. Caldwell County is a "unit" and "local government" under N.C. Gen. Stat. § 153A-216, *et seq.* It has the powers to establish, acquire, erect, repair, maintain, and operate a local confinement facility, also known as a detention facility or jail.

31. Caldwell County maintains and operates the Caldwell County Detention Center, located at 2351 Morganton Blvd. S.W., Lenoir, NC 28645. The Detention Center is designed to house 185 inmates (153 male beds and 32 female beds).

32. During the months of January 2019 through March 2020, the average daily inmate population at the Caldwell County Detention Center was 184 inmates, with a monthly average daily population of up to 206 inmates.

33. On March 16, 2020, the Caldwell County Detention Center began reducing its inmate population from 181 inmates. By April 20, 2020, there were only 97 inmates at the Detention Center, consisting of 76 men and 21 women. One inmate

8

was admitted to the Detention Center on April 21 and seven inmates (2 men and 5 women) were released on April 22, 2020.

34. Caldwell County is responsible, under N.C. Gen. Stat. § 153A-225, for developing an adequate medical plan to provide medical care to inmates at the Caldwell County Detention Center, including the medical supervision of inmates and emergency medical care for inmates to the extent necessary for their health and welfare.

35. Pursuant to 10A NCAC §14J.1001, the written medical plan must include policies and procedures that address the health screening of inmates upon admission and handling emergency medical problems, including but not limited to emergencies involving chemical dependency and mental health.

36. At all times relevant to this action, Caldwell County had final policymaking authority over the provision of medical care and emergency medical care to inmates at the Caldwell County Detention Center.

37. Caldwell County is sued under 42 U.S.C. § 1983 for an official policy or custom of deliberate indifference to the serious medical needs of inmates, like Ashley Stevens, with severe drug intoxication at the Caldwell County Detention Center.

38. Defendant Alan C. Jones ("Sheriff Jones") is a resident of Caldwell County, NC.

39. Sheriff Jones is the duly elected Sheriff of Caldwell County and he has been the Sheriff since 2007.

40. Sheriff Jones is sued in his official capacity only.

9

41. Sheriff Jones is responsible for the care and custody of the inmates at the Caldwell County Detention Center under N.C. Gen. Stat. § 162-22.

42. Sheriff Jones has an affirmative nondelegable duty to provide medical care, including mental health and substance abuse services, for inmates at the Caldwell County Detention Center under N.C. Gen. Stat. § 153A-221. *See State v. Wilson*, 183 N.C. App. 100, 104, 643 S.E.2d 620, 623 (2007).

43. At all times relevant to this action, Sheriff Jones had final policymaking authority at the Caldwell County Sheriff's Office for the provision of medical care and emergency medical care to inmates at the Caldwell County Detention Center.

44. At the times of the events alleged herein, the Caldwell County Detention Center had a Standard Operating Procedures (SOP) Manual which contained policies and procedures, including the Medical Plan, from May 2015. These policies and procedures were reviewed and approved by Sheriff Jones on October 16, 2015.

45. Sheriff Jones is responsible for appointing, employing, training, and supervising the detention officers and deputy sheriffs at the Caldwell County Detention Center.

46. At the time of the events alleged herein, Sheriff Jones had appointed Captain Mark Shook, pursuant to N.C. Gen. Stat. § 162-22, to serve as the Chief Administrator/Jailer and Keeper of the Caldwell County Detention Center.

47. Under Policies 1.04 and 4.01 of the Caldwell County Detention Center SOP Manual, Sheriff Jones designated Captain Shook as the person responsible for

10

developing and maintaining a medical plan for the inmate population that complied with the North Carolina Minimum Jail Standards.

48. On April 21-22, 2020, Captain Shook was responsible for the operation of the Caldwell County Detention Center and the provision of medical and emergency medical care to inmates, including Ashley Stevens.

49. At all times relevant to this action, Sheriff Jones had final policymaking authority at the Caldwell County Sheriff's Office for the training and supervision of the detention officers and the deputy sheriffs at the Caldwell County Detention Center.

50. Sheriff Jones is sued under 42 U.S.C. § 1983 for a policy or custom of deliberate indifference to the serious medical needs of inmates, like Ashley Stevens, with severe drug intoxication at the Caldwell County Detention Center.

51. Sheriff Jones is also sued under 42 U.S.C. § 1983 for a policy or custom of deliberate indifference to the inadequate training of detention officers at the Caldwell County Detention Center on detecting, screening, and handling medical and mental health emergencies from severe drug intoxication and the use of a restraint chair for inmates with severe drug intoxication.

52. Sheriff Jones has an official bond that was issued by Travelers Casualty and Surety Company of America in the amount of $10,000 as required by N.C. Gen. Stat. § 162-6. This official bond was in effect at the time of the events alleged herein.

53. Sheriff Jones is sued under N.C. Gen. Stat. § 58-76-5 as the principal on the official bond.

54. Sheriff Jones has waived governmental immunity for Plaintiff's claim under N.C. Gen. Stat. § 58-76-5 to the extent of the bond.

55. Defendant Travelers Casualty and Surety Company of America ("Travelers") is a Connecticut corporation that is duly licensed to conduct business in the State of North Carolina.

56. Travelers is sued as the surety on Defendant Sheriff Jones's official bond, pursuant to N.C. Gen. Stat. § 58-76-5.

**C.     Detention Officers**

57. Defendant Vicky Williams is a resident of Caldwell County, NC.

58. At the time of the events alleged herein, Defendant Williams was employed by the Caldwell County Sheriff's Office as a detention officer with the rank of Sergeant.

59. Defendant Leon Genwright is a resident of Caldwell County.

60. At the time of the events alleged herein, Defendant Genwright was employed by the Caldwell County Sheriff's Office as a detention officer with the rank of Corporal.

61. Defendant Drake Bradley is a resident of Caldwell County.

62. At the time of the events alleged herein, Defendant Bradley was employed by the Caldwell County Sheriff's Office as a detention officer.

63. Defendant Robert H. Parsons died in Caldwell County on October 19, 2021.

12

64. Plaintiff has contacted Defendant Parsons's surviving spouse to coordinate the appointment of an administrator for the Estate of Robert H. Parsons, file no. 21 E 860 (Caldwell County). Once an administrator is appointed for the Estate of Robert H. Parsons, Plaintiff will file a motion to add the administrator as a named defendant.

65. At the time of the events alleged herein, Defendant Parsons was employed by the Caldwell County Sheriff's Office as a detention officer.

66. Defendant Bryan Dame is a resident of Caldwell County.

67. At the time of the events alleged herein, Defendant Dame was employed by the Caldwell County Sheriff's Office as a detention officer.

68. Defendants Williams, Genwright, Bradley, and Parsons worked the nightshift from 6:00 p.m. on April 20 until 6:00 a.m. on April 21, 2020. These Defendants and Defendant Dame worked the nightshift from 6:00 p.m. on April 21 until 6:00 a.m. on April 22, 2020.

69. During the nightshifts on April 20-22, 2020, Defendant Williams was the Shift Commander and responsible for supervising all of the detention officers at the Detention Center.

70. Defendant Sandra Laws is a resident of Caldwell County.

71. At the time of the events alleged herein, Defendant Laws was employed by the Caldwell County Sheriff's Office as a detention officer with the rank of Sergeant.

72. Defendant Elisha Perry is a resident of Caldwell County.

13

73. At the time of the events alleged herein, Defendant Perry was employed by the Caldwell County Sheriff's Office as a detention officer with the rank of Corporal.

74. Defendant Brandi Eller is a resident of Caldwell County.

75. At the time of the events alleged herein, Defendant Eller was employed by the Caldwell County Sheriff's Office as a detention officer.

76. Defendants Laws, Perry, and Eller worked the dayshift from 6:00 a.m. until 6:00 p.m. on April 22, 2020.

77. During the dayshift on April 22, 2020, Defendant Laws was the Shift Commander and responsible for supervising all of the detention officers at the Detention Center.

78. At all times relevant to this action on April 21-22 2020, Defendants Williams, Genwright, Bradley, Parsons, Dame, Laws, Perry, and Eller were acting under color of state law as detention officers employed by the Caldwell County Sheriff's Office.

79. Defendants Williams, Genwright, Bradley, Parsons, Dame, Laws, Perry, and Eller are each sued in their individual capacity under 42 U.S.C. § 1983.

80. During their interactions with Ashley Stevens, as alleged herein, Defendants Williams, Genwright, Bradley, Parsons, Dame, Laws, Perry, and Eller acted in accordance with Sheriff Jones's policy or custom of deliberate indifference to the serious medical needs of inmates with severe drug intoxication at the Caldwell County Detention Center.

14

**D.    Institutional Medical Services, Dr. Piland, and Nurse Beam**

81.    Defendant Institutional Medical Services, PLLC ("Institutional Medical Services" or "IMS") is a North Carolina professional limited liability company.

82.    Institutional Medical Services maintains a registered office and principal place of business at the residence of its sole Member and Manager, Dr. John Henry Piland, III, in Iredell County, NC.

83.    At all times relevant to this action, Dr. Piland was the sole Manager and President of Institutional Medical Services and the only physician employed by IMS.

84.    Institutional Medical Services is in the business of providing medical care for inmates at jails under contract with local governments in North Carolina, including Caldwell County, Catawba County, Alexander County, and Lincoln County.

85.    At all times relevant to this action, Institutional Medical Services provided medical care to inmates at the Caldwell County Detention Center under an Agreement, dated July 1, 2011, between Caldwell County and IMS. Dr. Piland executed the Agreement on behalf of IMS. Caldwell County Manager Stan Kizer and Sheriff Jones jointly executed the Agreement on behalf of Caldwell County.

86.    Under the Agreement, Institutional Medical Services agreed to provide inmate medical care at the Caldwell County Detention Center, primarily through Dr. Piland, in exchange for a payment from Caldwell County in the amount of $22,312 per month ($267,744 per year).

87.    The terms of the Agreement required Institutional Medical Services to perform the following services at the Caldwell County Detention Center:

a. Cause Dr. Piland to direct the medical program at the Detention Center with the assistance of IMS partners and nurses;

b. Provide a nurse to operate a sick call clinic at the Detention Center 60 hours per week and a med-tech[4] for a minimum of 40 hours per week;

c. Cause Dr. Piland, with the assistance of a nurse, to be present for sick call clinic at least once each week, or otherwise as necessary;

d. Cause Dr. Piland, or his designee, to be available 24 hours per day for telephone consultation with the nurse, detention officers, or emergency medical services personnel regarding medical care for inmates;

e. Determine if emergency medical services are needed for an inmate and, at the discretion of IMS, handle the problems by a visit to the Detention Center or a referral to the Emergency Department at Caldwell Memorial Hospital;[5]

f. Develop protocols for Dr. Piland's approval on all non-emergency referrals requiring an outside physician and jail transportation;

g. Cause Dr. Piland to write orders for prescription and non-prescription medication, instructions for dispensing the medication, and to make recommendations for treatment of inmates;

h. Work closely with the Detention Center staff to identify ways to save money on inmate medical costs, while maintaining essential medical health care standards; and,

i. Follow the Caldwell County Medical Plan as well as the applicable laws and regulations of the State of North Carolina when providing medical care to inmates.

88. Dr. Piland has been the Medical Director at the Detention Center since, at least, July 1, 2011. He also serves as the Medical Director for IMS at other

---

[4] A "med-tech" is an unlicensed health care assistant who has been trained to provide certain tasks for patient care as directed by a licensed health care provider, such as a registered nurse.

[5] Caldwell Memorial Hospital is located three miles away from the Detention Center.

16

detention centers in North Carolina, including Catawba County, Alexander County, and Lincoln County.

89.     In his capacity as the Medical Director at the Caldwell County Detention Center, Dr. Piland was responsible for:

   a.  Directing the medical program at the Detention Center;

   b.  Providing medical services to inmates and making recommendations for the treatment of inmates;

   c.  Writing orders for prescription and non-prescription medications and instructions for dispensing the medication to inmates;

   d.  Supervising the care and treatment provided by the nursing staff to inmates;

   e.  Being available 24 hours per day for telephone consultations with the nurse, detention officers, and EMS personnel regarding medical care for inmates;

   f.  Determining if emergency medical services are needed for an inmate and either handling the problems by a visit to the Detention Center or referring the inmate to the Emergency Department at Caldwell Memorial Hospital;

   g.  Establishing policies, procedures, guidelines, and protocols for the medical care of inmates; and,

   h.  Complying with the Caldwell County Medical Plan and relevant standards for the provision of health care to inmates.

90.     Under the Agreement, Institutional Medical Services did not have any nursing staff present at the Detention Center from 6:00 p.m. through 8:00 a.m. on weekdays and there were no nursing staff present on weekends. The nursing staff did not have any on-site medical supervision unless Dr. Piland was present at the

17

Detention Center for sick call. IMS did not employ any other physicians or a physician extender.

91. Dr. Piland had final policymaking authority at Institutional Medical Services for the provision of medical care to inmates at the Caldwell County Detention Center, including inmates with severe drug intoxication.

92. At all times relevant to this action, Institutional Medical Services acted under color of state law while providing health care services to inmates at the Caldwell County Detention Center.

93. Institutional Medical Services is sued under 42 U.S.C. § 1983 for a policy or custom of deliberate indifference to the serious medical needs of inmates, like Ashley Stevens, with severe drug intoxication at the Caldwell County Detention Center.

94. Institutional Medical Services is also sued under North Carolina law for corporate negligence and gross negligence.

95. Defendant John Henry Piland, III, MD ("Dr. Piland") is a resident of Iredell County, NC.

96. At all times relevant to this action, Dr. Piland was duly licensed to practice medicine in the State of North Carolina and his primary area of practice was family medicine.

97. Dr. Piland has been licensed to practice medicine in North Carolina since May 1990.

18

98. At the time of the events alleged herein, Dr. Piland was a family medicine physician employed by Institutional Medical Services as the Medical Director for the Caldwell County Detention Center. He lived in Statesville, NC, approximately 43 miles and 55 minutes away from the Detention Center.

99. At all times relevant to this action, Dr. Piland was acting under color of state law as a licensed physician and the Medical Director employed by Institutional Medical Services at the Caldwell County Detention Center.

100. Defendant Elizabeth B. Beam ("Nurse Beam") is a resident of Catawba County, NC.

101. At all times relevant to this action, Nurse Beam was a registered nurse (RN) who was duly licensed to practice nursing in North Carolina under N.C. Gen. Stat. § 90-171.20 and 21 NCAC § 36.0224.

102. Nurse Beam has been licensed as an RN in North Carolina since March 1981.

103. At the time of the events alleged herein, Nurse Beam was employed by Institutional Medical Services as an RN and she worked at the Caldwell County Detention Center under the supervision of Dr. Piland.

104. Upon information and belief, Nurse Beam worked for IMS as an RN at other detention centers in North Carolina, including Catawba County, Alexander County, and/or Lincoln County.

105. In her capacity as an RN at the Caldwell County Detention Center, Nurse Beam was responsible for:

19

a. Assessing an inmate's physical and mental health;

b. Planning and providing nursing care;

c. Recording and reporting the results of her nursing assessment and care;

d. Collaborating with Dr. Piland to determine appropriate health care for the inmate;

e. Delegating appropriate tasks to the med-techs; and,

f. Supervising the med-techs.

106. At all times relevant to this action, Nurse Beam was acting under color of state law as a registered nurse employed by Institutional Medical Services at the Caldwell County Detention Center.

107. Dr. Piland, Nurse Beam, and Institutional Medical Services were Ashley Stevens' treating health care providers at the Caldwell County Detention Center.

108. During their interactions with Mr. Stevens, as alleged herein, Dr. Piland and Nurse Beam acted in accordance with Institutional Medical Services' policy or custom of deliberate indifference to the serious medical needs of inmates with severe drug intoxication.

109. At all times relevant to this action, Dr. Piland and Nurse Beam were health care providers as defined in N.C. Gen. Stat. § 90-21.11.

110. In addition to Plaintiff's civil rights claims, this is a medical malpractice action under North Carolina law alleging that Dr. Piland and Nurse Beam failed to comply with the applicable standard of care under N.C. Gen. Stat. § 90-21.12(a) in their care and treatment of Mr. Stevens.

111. The medical care provided to Mr. Stevens by Dr. Piland, and all medical records pertaining to the alleged negligence and gross negligence that are available to the Plaintiff after a reasonable inquiry, have been reviewed by a board-certified family medicine physician who is reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and is willing to testify that the medical care provided by Dr. Piland did not comply with the applicable standard of care for a family medicine physician.

112. The medical care provided to Mr. Stevens by Nurse Beam, and all medical records pertaining to the alleged negligence and gross negligence that are available to the Plaintiff after a reasonable inquiry, have been reviewed by a board-certified family medicine physician and a board-certified family nurse practitioner who are each reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and are each willing to testify that the medical care provided by Nurse Beam did not comply with the applicable standard of care for a registered nurse.

113. Dr. Piland was acting within the course and scope of his employment with Institutional Medical Services during his communications with the detention staff about Mr. Stevens' medical condition, as alleged herein.

114. Nurse Beam was acting within the course and scope of her employment with Institutional Medical Services during her interactions with Mr. Stevens, as alleged herein.

21

115. Institutional Medical Services is sued under North Carolina law, pursuant to the doctrine of Respondeat Superior, for the medical malpractice committed by Dr. Piland and Nurse Beam.

## FACTUAL ALLEGATIONS

116. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

### A. Background Information

117. Ashley Stevens was born in 1977 in Lenoir, NC. His parents were Hurl Moyer Stevens and Linda Fay Stevens, and he had one sister, three half-sisters, and a step-brother. Mr. Stevens lived his entire life in Caldwell County. He attended South Caldwell High School but did not graduate.

118. During his adult years, Mr. Stevens primarily lived with his mother, Linda Stevens, in Lenoir and Hudson. He worked as a laborer and enjoyed spending time outdoors, especially walking, hiking, fishing and hunting. Mr. Stevens was a long-time member of Calvary Advent Christian Church in Lenoir.

119. Mr. Stevens had two legitimated daughters, Madeline Loraine Paszek-Lowman and Myra Paszek, two grandsons, and an illegitimate minor son.

120. Mr. Stevens was never convicted of any felony offenses and his last misdemeanor conviction was in 2009.

121. Mr. Stevens used methamphetamine on occasions prior to his death. He was never arrested for possession of methamphetamine, never ordered to receive substance abuse treatment for methamphetamine use, and never involuntarily

committed or hospitalized for methamphetamine use or substance abuse. Mr. Stevens did not have any diagnosed mental health disorders.

122. At the time of the events alleged herein, Mr. Stevens resided with his mother at 2306 SW Central Drive, Lenoir, NC 28645.

**B.     Arrest: Evening of April 20, 2020**

123. On the evening of Monday, April 20, 2020, Ashley Stevens was at his mother's residence in Lenoir when he obtained methamphetamine from someone in a red van and snorted an unknown amount.

124. Afterwards, Linda Stevens saw her son in the garage acting strange. He was looking across the road and said that "little purple people were in the trees." A neighbor, who lived across the street, also saw Mr. Stevens looking at the trees, talking about God, and heard him say that he saw "green men."

125. Mr. Stevens became severely intoxicated from the methamphetamine. He was hallucinating, talking incessantly and unintelligibly, moving constantly, and acting abnormally.

126. At or around 11:05 p.m., Mr. Stevens walked less than 500 feet down the road to a residence at 501 SW Lincoln Lane wearing blue jeans and a navy muscle tank-top without shoes. He entered the backyard of the residence, for no apparent reason, and fought with a dog that attacked him. Mr. Stevens appeared heavily intoxicated and disoriented, and he told the female resident that his name was Stevens or Steve. When she asked him to leave, he responded by "asking where his

23

kids are and saying he is a US Marshal." Mr. Stevens then jumped or fell over a fence and went to the neighboring yard before returning to 501 Lincoln Lane.

127. At 11:10 p.m., the resident called the City of Lenoir/Caldwell County 911 Communications Center and reported a suspicious person in her backyard. She told the dispatcher that the man was trying to fight one of her dogs in the backyard and that she asked him to leave but "he is totally out of it."

128. Officer Cesar Rubio, Sergeant Gibson, and Officer Dibella of the Lenoir Police Department were dispatched to the call and arrived by 11:18 p.m. Mr. Stevens likely ingested the rest of his methamphetamine when the officers arrived. At 11:28 p.m., he was handcuffed by the officers and taken into custody. Mr. Stevens was agitated, and he told the officers that his name was "Pablo" and started to say "Pablo Escobar." After talking with the resident, the officers were able to identify him as Ashley Hurl Stevens.

129. At 11:42 p.m., Officer Rubio took Mr. Stevens to the Magistrate's Office. Mr. Stevens was charged with first degree trespassing, injury to real property, cruelty to animals, and violation of Governor's order, all misdemeanor offenses. He was ordered to post a $1500 secured bond and was taken to the Caldwell County Detention Center.

**C.    Policies and Customs at the Caldwell County Detention Center**

130. On and before April 21, 2020, Caldwell County, Sheriff Jones, and IMS were aware that methamphetamine use was prevalent in Caldwell County and

24

individuals who were severely intoxicated on methamphetamine were regularly arrested and brought to the Caldwell County Detention Center.

131. Policy 2.03 ("Condition of Inmate Upon Admission") of the SOP Manual prohibited the admitting officer(s) at the Detention Center from admitting individuals "with any noticeable injuries, illnesses, emotional problems or severe intoxication that would lead the officer to believe that the inmate may be in need of immediate medical care." The policy defined "severe intoxication" as a condition in which "the individual may pass out, vomit, and/or registers a .25 or higher on the Alco-Sensor" and differentiated it from conditions and behaviors involving "depression or emotional problems where the person appears he/she could become violent or uncontrollable."

132. Policy 2.03 specified that an inmate "who appears to be under the influence of alcohol or drugs but does not seem to require immediate medical attention shall be initially confined in the Detention Facility's holding area or, if occupied, in a single cell available within the facility."

133. Under Policy 2.03, individuals with severe drug intoxication were not classified as inmates who may need "immediate medical care."

134. As a result, the policy or custom at the Caldwell County Detention Center was to admit inmates with severe drug intoxication, including from methamphetamine use, to the Detention Center and to place them in a holding cell for detoxification instead of sending them to the Emergency Room at Caldwell Memorial Hospital.

25

135. The Sheriff's policy or custom was inadequate and did not provide appropriate medical care to inmates with serious medical needs from severe drug intoxication.

136. Sheriff Jones and Caldwell County knew that Institutional Medical Services did not have any medical staff present at the Detention Center from 6:00 p.m. until 8:00 a.m. on weekdays and during the weekends.

137. The Detention Center did not have sufficient medical staffing, supervision, and resources to medically treat and monitor an inmate with severe drug intoxication.

138. Sheriff Jones also knew that the detention officers did not receive any in-service training on how to detect and handle a medical or mental health emergency from severe drug intoxication, including methamphetamine use.[6]

139. The decisions about whether to admit or obtain medical treatment for an inmate with severe drug intoxication during the nightshift at the Detention Center were made by inadequately trained detention officers without any medical supervision or assistance.

140. Pursuant to 10A NCAC §§14J.1001-.1002, Policy 2.11 ("Preliminary Health Screening") of the SOP Manual required the admitting officer(s) to complete

---

[6] All detention officers are required to complete the Detention Officer Certification Course approved by the N.C. Sheriff's Education & Training Standards Commission. The Certification Course provides basic training to detention officers with the expectation that law enforcement agencies will provide additional in-service training. The detention officers received basic training on the signs and symptoms of methamphetamine use and withdrawal during Suicides and Crisis Management.

a Preliminary Health Screening Form for each newly admitted inmate prior to the placement of the inmate in the holding cell or holding area of the Detention Center and to maintain a copy in the inmate's medical chart.[7] The Preliminary Health Screening Form was also required by Policy 1.04 ("Reports and Records") and Policy 2.03.

141. Contrary to these mandatory requirements, Sheriff Jones had an unwritten policy or custom which allowed detention officers to not complete the Preliminary Health Screening Form if an inmate was agitated, aggressive, violent, disruptive, or uncooperative during the booking process.

142. This unwritten policy or custom also applied to the Officer's Statement of Providing Assistance [Intoxicated Person] Form which the admitting officer was required to complete and file in the inmate's record under Policies 2.03[8] and 2.12[5] when an intoxicated person was admitted to the Detention Center.

143. Sheriff Jones's unwritten policy or custom was inadequate and made it more difficult for inmates with serious medical needs from severe drug intoxication to obtain appropriate medical care and monitoring.

144. Upon information and belief, Caldwell County and IMS were aware of the Sheriff's unwritten policy or custom on Preliminary Health Screening Forms and knew that it was inconsistent with the requirements in the Medical Plan at the Detention Center for the health screening of inmates upon admission.

---

[7] The Preliminary Health Screening "is a procedure for each newly-admitted inmate that combines visual observation with an interview to obtain relevant information about the inmate's physical and mental health." 10A NCAC §14J.0101(17).

27

145.  Under Policy 4.05 ("Emergency Medical Plan"), the Caldwell County Detention Center provided 24-hour emergency medical care services to meet the health care needs of inmates through a local health care provider, hospitals, and EMS. An "emergency medical problem" is "a serious medical need … that requires immediate medical attention and that cannot be deferred until the next scheduled sick call or clinic." 10A NCAC §14J.1001.

146.  Under Policy 4.05, all detention officers were required to be trained during their first year of employment to detect the signs and symptoms of medical emergencies, including "Signs of alcohol or drug intoxication."[8] Upon the discovery of a medical emergency, the detention officer or the medical personnel on duty were responsible for assessing the inmate's condition, collecting vital signs, and contacting the IMS Medical Director or nurse on call, EMS, and the Jail Administrator.

147.  Contrary to Policy 4.05 and the North Carolina Minimum Jail Standards, Sheriff Jones had a written policy at the Detention Center, as set forth in the Inmate Handbook, which defined "emergency medical care" as "a situation requiring immediate medical intervention due to an imminent, life-threatening (life or death) situation."

148.  Due to the Sheriff's policy definition, the Caldwell County detention officers only obtained emergency medical care for severely intoxicated inmates if an imminent life or death situation existed.

---

[8] The Certification Course's training on Medical Care in the Jail instructed students that an "emergency medical problem" includes "serious alcohol or drug-induced intoxication."

28

149. Upon information and belief, Dr. Piland approved the Sheriff's policy definition and Institutional Medical Services used the same policy or custom when determining if emergency medical services were needed for an inmate at the Detention Center.

150. The Sheriff's policy definition of "emergency medical care" was inadequate because it did not provide appropriate medical care to inmates with serious medical needs from severe drug intoxication.

151. Upon information and belief, Caldwell County was aware of the Sheriff's policy definition and knew that it was inconsistent with the requirements in the Medical Plan at the Detention Center for handling emergency medical problems.

152. In addition, Policy 7.11 ("Use of Physical Restraints") and Policy 7.09 ("Use of Force") prohibited detention officers from using physical restraints to control an inmate's behavior at the Detention Center.

153. Before April 21, 2020, Sheriff Jones had authorized the purchase and use of a restraint chair at the Detention Center for combative, self-destructive, or potentially violent inmates.

154. The SOP Manual at the Detention Center did not have any policies or procedures for the use of a restraint chair and, upon information and belief, the Sheriff did not provide any training to the detention officers on the use of a restraint chair for inmates with severe drug intoxication.[9] As a result, detention officers used

---

[9] Physical restraints should only be used with chemical sedation on a patient with severe methamphetamine intoxication, and should be removed as quickly as possible.

29

the restraint chair to control an inmate's behavior, including agitation and/or psychosis from severe drug intoxication, without any limitations or requirements.

155. Pursuant to the policies and/or customs alleged above, inmates with severe drug intoxication who were admitted to the Caldwell County Detention Center and confined to a holding cell for detoxification did not receive any medical care or monitoring unless IMS medical staff were present at the Detention Center during the dayshift on a weekday.

156. In addition, when these severely intoxicated inmates displayed any agitation or psychosis during the booking and admission process, the detention officers were authorized by the Sheriff's unwritten policies and/or customs to not complete the Preliminary Health Screening Form and Officer's Statement of Providing Assistance [Intoxicated Person] Form and to physically restrain the inmate in a restraint chair for excessive periods of time without proper medical care.

**D.      Booking and Admission: April 21, 2021**

157. At 12:23 a.m. on Tuesday, April 21, 2020, Officer Rubio and Sergeant Gibson escorted Mr. Stevens into the booking room at the Detention Center.

158. The booking room is adjacent to the sally port, medical room, dress-out room, and administrative room, and contains a booking desk for two officers with computers and video monitors for the holding cells, sally port, and other areas. The four holding cells, including Holding Cell 203 and Holding Cell 206, are in a hallway adjacent to the booking room.

159. Defendants Sergeant Vicky Williams, Corporal Leon Genwright, and Officer Drake Bradley were present in the booking room, and Officer Robert H. Parsons arrived several minutes later. No IMS medical staff were present.

160. Before Mr. Stevens arrived, Linda Stevens called the Detention Center twice, talked with Sergeant Williams, and told her that her son had taken some bad stuff and needed to be taken to the hospital. In response, Sergeant Williams stated, "We don't do that."

161. The detention officers interacted with Mr. Stevens for 12 minutes in the booking room. Mr. Stevens was obviously intoxicated on drugs. He was constantly smiling, fidgeting, and talking in an unintelligible manner, had unusual facial expressions and mannerisms, acted bizarrely and agitated when Corporal Genwright brought an infrared forehead thermometer near him, and started undressing in the booking room. Mr. Stevens was experiencing acute psychosis from severe methamphetamine intoxication.

162. At 12:35 a.m., Corporal Genwright, Officer Bradley, and Officer Parsons took Mr. Stevens to the dress-out room. Mr. Stevens was unable to follow directions, kept his hands on his head, and responded incoherently and nonsensically to the officers. Officer Parsons reacted to Stevens' behavior by asking what drugs had he taken ("What are you on?") and stating that he needed to stop acting "stupid."

163. Mr. Stevens was handcuffed in the dress-out room. While Corporal Genwright and Officer Bradley removed his jeans, Mr. Stevens displayed intense mood swings and became very agitated. He growled at Officer Parsons, shouted about

31

Pablo Escobar, and made other nonsensical statements. When Corporal Genwright and Officer Bradley were attempting to remove his underwear, Mr. Stevens lost his balance, and fell to the ground. The officers stood him back up but he was agitated and shouting about Pablo Escobar. Officer Bradley took Mr. Stevens to the floor, held him by the neck and head, and punched him twice in the face while he was handcuffed. As Officer Bradley straddled Mr. Stevens on the ground and held his neck with one hand, Mr. Stevens kicked his legs and screamed incoherently. Officer Parsons sprayed Mr. Stevens in the eyes 4-5 times with Oleoresin-Capsicum (OC) spray and Officer Bradley sprayed him 1-2 times.

164. Sergeant Williams described Mr. Stevens' behavior as follows:

Inmate Ashley Stevens was irate and seemed to be on some type of drugs. I asked the officers from LPD what the inmate was on and they stated that they didn't know. I asked Inmate Stevens what drugs had he taken and he wouldn't answer my question but was talking crazy. Inmate Stevens didn't want to comply with anything I asked him and he would growl at the officers in a [sic] angry matter [sic].

165. Mr. Stevens and the officers were affected by the OC spray. The officers left the dress-out room while Mr. Stevens continued growling and screaming incoherently while sitting in his underwear on the floor in handcuffs. Sergeant Gibson and Officer Rubio entered the room and secured Mr. Stevens' legs with leg shackles.

166. At the direction of Sergeant Williams, Mr. Stevens was removed from the dress-out room and placed in a restraint chair at 12:42 a.m. without being decontaminated from the OC spray. His shoulders, waist, wrists, and ankles were restrained and a spit mask was placed over his face and head. Mr. Stevens was unable to remain still and the officers had to hold him while the restraints were secured. He

32

had severe agitation and was breathing heavily, moaning, mumbling, screaming incoherently, shouting "Jesus," and struggling against the restraints.

167. During the booking and admission process, and throughout his detention, Mr. Stevens was severely intoxicated on methamphetamine and had suffered an overdose.

168. Severe methamphetamine intoxication or overdose causes psychosis, severe agitation, hyperactivity, hypertension (high blood pressure), tachycardia (high heart rate), hyperthermia (elevated body temperature), and diaphoresis (abnormal sweating). The half-life of methamphetamine is 9-24 hours. A person with severe methamphetamine intoxication or overdose can develop dangerous and fatal complications, including dehydration, hypovolemia (loss of blood volume), hypernatremia (increased sodium), rhabdomyolysis (breakdown of muscle tissue), acute renal (kidney) failure, and cardiac arrest.

169. Mr. Stevens had a serious medical condition and he needed to receive a proper medical assessment and emergency medical care.[10]

170. Mr. Stevens' medical condition was so obvious that a lay person, including a detention officer, would have recognized that it required medical attention and treatment.

171. Sergeant Williams and Corporal Genwright were the booking and admitting officers who were responsible for observing Mr. Stevens' condition, determining whether to admit him to the Detention Center, and, if admitted,

---

[10] Alcohol and drug intoxication is the leading cause of death in jails.

33

completing a Preliminary Health Screening Form and an Officer's Statement of Providing Assistance [Intoxicated Person] Form.

172. During the booking and admission process, Sergeant Williams and Corporal Genwright knew or strongly suspected that Mr. Stevens had a serious medical need. They recognized that Mr. Stevens was exhibiting significant signs and symptoms of methamphetamine use.

173. Despite their knowledge, Sergeant Williams and Corporal Genwright admitted Mr. Stevens to the Caldwell County Detention Center, did not contact the IMS medical staff, Caldwell County EMS, or any other health care providers, and did not obtain any medical treatment for him.

174. In accordance with the Sheriff's policy or custom, Sergeant Williams and Corporal Genwright did not complete a Preliminary Health Screening Form and an Officer's Statement of Providing Assistance [Intoxicated Person] Form for Mr. Stevens.

175. According to Captain Mark Shook, the Jail Administrator, the Preliminary Health Screening Form was not completed because Mr. Stevens was "violent and uncooperative" during the booking process.

E. **Mr. Stevens is Confined in Holding Cell 203 in a Restraint Chair for More Than 11 Hours**

176. At 12:55 a.m., Officer Bradley and Sergeant Williams moved Mr. Stevens in the restraint chair with the leg shackles and spit mask in place to Holding Cell 203 for the purpose of "Detoxification" from drug use.

34

177. Holding Cell 203 is in a hallway adjacent to the booking room approximately 25-30 feet from the booking desk and medical room. Cell 203 has video surveillance which allowed the detention officers to watch Mr. Stevens in the cell on a video monitor at the booking desk. The cell also has a small bench and a metal toilet with sink.

178. Officer Bradley rolled the restraint chair into Holding Cell 203 and positioned Mr. Stevens within a few feet of the door near the front of the cell.

179. Mr. Stevens was confined in Cell 203 in the restraint chair from 12:55 a.m. until 12:15 p.m. on April 21, 2020, more than 11 hours. While he was in Cell 203, Mr. Stevens was fully restrained in the restraint chair with the spit mask over his head and face and he was only wearing underwear.

### 1. Mr. Stevens Is Highly Agitated In the Restraint Chair

180. From 12:55 a.m. until 6:00 a.m., Mr. Stevens was agitated, psychotic, yelling, mumbling, struggling against the restraints, and sweating profusely. He was constantly moving in the restraint chair and screaming or talking incoherently. He appeared delusional, his facial expressions were bizarre, and his eyes were wild. Mr. Stevens moved the restraint chair to the back of the cell by thrashing against the restraints.

181. Sergeant Williams and Corporal Genwright were responsible for Mr. Stevens and they observed and monitored his condition through the cell window, on the video monitor, and in the cell. Officer Bradley and Officer Parsons were aware of Mr. Stevens' condition and observed him several times as well.

182. During this period, Mr. Stevens was severely intoxicated on methamphetamine and no IMS medical staff were present at the Detention Center. His medical condition was so obvious that Sergeant Williams and Corporal Genwright were either aware or strongly suspected that he had a serious medical need.

183. Despite their knowledge, Sergeant Williams and Corporal Genwright did not contact the IMS Medical Director or nurse on call, EMS, or any other healthcare providers to obtain medical attention and treatment for Mr. Stevens. In addition, they did not collect his vital signs.

184. Mr. Stevens did not receive any medical care, food, or fluids and he was never released from the chair to use the toilet. None of the nightshift detention officers contacted any health care providers about Mr. Stevens.

185. At 2:54 a.m., Corporal Genwright and Officer Bradley went into Cell 203, tightened the restraints and straightened the chair while Sergeant Williams watched. Mr. Stevens was highly agitated, yelling, and violently thrashing his body around in the chair.

186. At 3:08 a.m., Corporal Genwright and Sergeant Williams returned to Cell 203 with an unknown deputy sheriff and Police Officers Rubio and Dibella. The deputy sheriff removed the leg shackles and the restraints were checked and tightened. Mr. Stevens was still highly agitated.

187. At 5:31 a.m., Sergeant L. Carroll and Corporal Joseph Robert Snelling, two dayshift detention offices, tried to talk with Mr. Stevens in Cell 203 while

36

Corporal Genwright, Sergeant Williams, and another detention officer watched. Mr. Stevens was incoherent and delusional. When all of the officers left the room and were talking in the hall, Sergeant Williams made a hand gesture that Mr. Stevens was crazy.

188. Before their shift ended, Sergeant Williams and Corporal Genwright briefed Sergeant Carroll and Corporal Snelling about Mr. Stevens' behavior and condition during the nightshift. Sergeant Carroll and Corporal Snelling did not complete a Preliminary Health Screening Form for Mr. Stevens even though they were aware it had not been completed on the prior shift.

189. At 6:08 a.m., Sergeant Carroll, Corporal Snelling, and Officer Thad Webb entered Cell 203 while Corporal Genwright watched from outside. Sergeant Carroll and Corporal Snelling checked and tightened the restraints again while Mr. Stevens was agitated, moving, and talking incoherently.

190. During the next 2½ hours, Mr. Stevens was constantly yelling, moving, and/or struggling against the restraints.

### 2. IMS Nurse Beam Does Not Assess Mr. Stevens' Medical Condition or Provide Any Treatment

191. IMS Nurse Elizabeth B. Beam arrived at the Detention Center around 7:50 a.m. and IMS Med-Tech Alethia Dawn Avery arrived around 8:15 a.m. Nurse Beam was briefed about Mr. Stevens' behavior and condition. She was aware that Mr. Stevens was being held in a restraint chair in Holding Cell 203 for detoxification from drugs and that a Preliminary Health Screening Form had not been completed for him.

37

192.    At 8:42 a.m., IMS Nurse Beam went to Cell 203 and stood outside with Sergeant J. Morrison while Sergeant Carroll and a female detention officer were in the cell with Mr. Stevens. Mr. Stevens was offered Gatorade while in the restraint chair with the spit mask in place, but responded in an agitated state and did not drink any.

193.    While Nurse Beam was standing in the hall, Med-Tech Avery joined her along with other detention officers and leadership, including Captain Mark Shook, the Jail Administrator, and Lieutenant Thomas Bailey, the Assistant Jail Administrator.

194.    At 8:48 a.m., Nurse Beam and Med-Tech Avery entered Cell 203 without any medical equipment in the presence of Sergeant Carroll and a female detention officer. Nurse Beam checked Mr. Stevens' wrists and ankles in the restraints and then left without taking any vital signs. The examination lasted 30 seconds.

195.    Nurse Beam noted that Mr. Stevens was:

- Talking about "the Lord told me to do better;"

- Moving his fingers and toes constantly;

- Offered Gatorade but was unable to drink it due to agitation; and,

- Yelling about God, the rapture, and the end of time.

196.    Med-Tech Avery recalled that Mr. Stevens was making religious comments, including that the jail staff were all the devil, that he was not going to take the mark of the beast, and that Jesus made him do this.

197. At 9:44 a.m., Nurse Beam returned to Cell 203 with Corporal Snelling and Officer Webb. Nurse Beam had a blood pressure cuff but did not take Mr. Stevens' blood pressure or other vital signs. She checked his restrained wrists and ankles again and completed her examination within a minute.

198. Nurse Beam noted that Mr. Stevens' condition was unchanged and that he was:

- Screaming "I am not going to take the mark of the beast;"
- Moving and jerking his body;
- Yelling "leave me alone;" and,
- Talking about God and that God is telling him things.

199. At 10:34 a.m., Nurse Beam and Med-Tech Avery entered Cell 203 with a detention officer. Nurse Beam noted that Mr. Stevens was resting in the restraint chair with his eyes closed and when she spoke to him, Mr. Stevens said she was Satan. She checked Mr. Stevens' wrists and ankles and observed that his left ankle was red with slight swelling. Nurse Beam had a blood pressure cuff and a pulse oximeter with her but she did not take his vital signs. The examination lasted less than 90 seconds.

200. Based on her interactions with Mr. Stevens, Med-Tech Avery concluded that Mr. Stevens was severely intoxicated on methamphetamine because he was hyped up, acting aggressive, agitated, combative, and uncooperative.

201. Nurse Beam also concluded that Mr. Stevens was severely intoxicated on methamphetamine.

202. At 11:06 a.m., Nurse Beam entered Cell 203 without any medical equipment in the presence of two detention officers. She checked his wrists and ankles and again observed the redness on his left ankle. At Nurse Beam's request, the detention officers slightly loosened the ankle restraints. Nurse Beam still did not take Mr. Stevens' vital signs and her examination was completed within a minute.

203. At 11:35 a.m., Sergeant Carroll and Corporal Snelling entered Cell 203 to check on Mr. Stevens because he had appeared unresponsive for approximately thirty minutes. Mr. Stevens told Sergeant Carroll that he was talking to God and to leave him the hell alone. Nurse Beam joined the officers, checked Mr. Stevens' wrists and ankles, and tapped him on the knee to get his attention. Nurse Beam again did not take his vital signs, and she only noted that he was "talking about God."

204. Around 12:00 p.m., Mr. Stevens resumed moving in the restraint chair, mumbling, and talking incessantly with bizarre facial expressions.

205. At 12:12 p.m., Lieutenant Bailey and Sergeant Morrison entered Cell 203 and they attempted to speak with Mr. Stevens. When they spoke with Mr. Stevens, he would only state, "I'll do whatever Jesus wants me to do." Lieutenant Bailey and Sergeant Morrison made the decision to remove him from the restraint chair and place him in a padded cell.

206. While he was in Cell 203 in the restraint chair during the dayshift, Mr. Stevens did not consume any fluids, eat any food, or sleep, and he was never released from the chair to use the toilet. Mr. Stevens did not receive any medical treatment or

40

monitoring from Nurse Beam or any other healthcare provider for his severe drug intoxication.

**F.      Mr. Stevens Is Confined in Holding Cell 206 For Nearly 20 Hours**

207.    At 12:16 p.m., Sergeant Morrison rolled Mr. Stevens out of Holding Cell 203 and into the hall outside Holding Cell 206.

208.    Holding Cell 206 is less than 10 feet across the hall from Cell 203 and approximately 25-30 feet from the booking desk and medical room. Cell 206 has video surveillance which allowed the detention officers to watch Mr. Stevens in the cell on a video monitor at the booking desk. The cell is approximately 8' deep and 6' wide, the walls are padded, and it has a grated hole in the floor that serves as a toilet.

209.    Sergeant Carroll and Corporal Snelling removed the restraints from Mr. Stevens in front of Lieutenant Bailey and Sergeant Morrison. Mr. Stevens was lifted out of the chair and he collapsed onto a thin plastic mattress on the floor of Cell 206. Sergeant Carroll and Corporal Snelling then entered the cell with Officer Tyler Gilliam and removed the spit mask.

210.    Once the restraints were removed, Mr. Stevens had visible abrasions and contusions on his ankles, wrists, and left shoulder from the restraint chair and deep scratches on his lower back and upper buttocks.

211.    Mr. Stevens was confined in Cell 206 for ongoing Detoxification from drug use for nearly 20 hours. He had obvious signs and symptoms of an overdose from methamphetamine and his condition worsened during his detention.

41

212. At 12:21 p.m., Mr. Stevens stood up, walked around, and started having diarrhea over and around the grated hole. He quickly soiled his underwear, removed and discarded the soiled underwear, and was naked in the cell.

### 1. Nurse Beam Does Not Assess or Treat Mr. Stevens in Cell 206

213. At 12:23 p.m., Nurse Beam walked to Cell 206 and watched Mr. Stevens through the cell window for 17 seconds before she walked away. She quickly returned to the cell door, asked Mr. Stevens a brief question, and left. Nurse Beam saw the diarrhea on the floor, observed that Mr. Stevens was walking in the cell, and noted that he said he "wants to pray" and continues to talk about God and praying.

214. During the next 9 hours, Mr. Stevens was continuously walking and standing in Cell 206 while constantly moving, mumbling, talking incoherently, and acting bizarrely. He was psychotic, delusional, agitated, breathing heavily, and frequently doubled-over or squatting with severe abdominal pain or diarrhea.[11]

215. At 12:43 p.m., Nurse Beam walked down the hall and listened to Sergeant Carroll talk with Mr. Stevens through the window of Cell 206. She noted that Mr. Stevens was continuing to walk in the cell, that he was "talking about the rapture and the end of time," and that he does not answer questions but "only talks of God, rapture, praying to God."

216. At 12:58 p.m., Nurse Beam watched Officer Gilliam place a small bottle of water in the tray opening on the cell door with Sergeant Carroll and Corporal

---

[11] Increased respiratory rate and gastrointestinal issues are signs of severe methamphetamine intoxication.

42

Snelling present. Mr. Stevens did not take the bottle from Officer Gilliam and instead walked around in the cell continuing to talk of God, the rapture, and heaven.

217. A few minutes later, Officer Gilliam and another detention officer returned with an open bottle of water and placed it in the tray opening again. Mr. Stevens responded incoherently to the officer and kicked the bottle away onto the hall floor. Nurse Beam was near the booking area. She heard the commotion, saw what happened, and watched Mr. Stevens on the video monitor at the booking desk.

218. At 1:37 p.m., Nurse Beam attempted to talk with Mr. Stevens through the window at Cell 206 after Officer Gilliam observed him mumbling at the cell door. Mr. Stevens responded to Nurse Beam by telling her that he "wants his balls shot off."

219. During the next 30 minutes, Mr. Stevens appeared sick and disoriented. At 2:03 p.m., he had diarrhea while standing at the cell door and he just stood over it mumbling, swaying and holding onto the door.

220. At 2:13 p.m., Nurse Beam went to Cell 206 with Sergeant Carroll, Corporal Snelling, and a third detention officer. She briefly looked into the cell window and saw Mr. Stevens standing over diarrhea on the floor. She quickly stood back in the hall, listened to Mr. Stevens repeatedly talk about God, and watched the officers place a small Dixie cup (5 oz.) with water in the tray opening. Mr. Stevens was agitated and walked around the cell without touching the Dixie cup.

43

221. Nurse Beam did not have any other interactions with Mr. Stevens. When she returned to the medical room, Nurse Beam talked with IMS Med-Tech Denise Horton about Mr. Stevens' condition.

222. Nurse Beam left the Detention Center around 2:30 p.m. and did not return. She was aware that another RN would not be present at the Detention Center until 8:00 a.m. on April 22, 2020.

223. When Nurse Beam interacted with and observed Mr. Stevens in Cell 203 and Cell 206, Mr. Stevens was psychotic, delusional, agitated, hyperactive, sweating abnormally, and had other obvious signs and symptoms of severe methamphetamine intoxication.

224. Nurse Beam knew or strongly suspected that Mr. Stevens had a serious medical need.

225. Despite her knowledge, Nurse Beam did not assess Mr. Stevens' condition, prepare a plan of care, take his vital signs, monitor his fluid intake and output, perform a dehydration pinch test, complete a health screening, contact the IMS Medical Director, EMS, or another health care provider, or obtain any medical treatment for him.

226. Once Nurse Beam left, Med-Tech Horton was present at the Detention Center without any other IMS medical staff. Nurse Beam could not delegate any nursing care tasks for Mr. Stevens to Med-Tech Horton because Nurse Beam had not properly assessed his condition, had not prepared a plan of care, and had no RN supervision available.

227. Med-Tech Horton did not provide any nursing care to Mr. Stevens before she left the Detention Center around 5:00 p.m.

228. At 4:10 p.m., Mr. Stevens grabbed the Dixie cup from the tray opening, walked around the cell, took a sip of water, and had severe abdominal pain that forced him to double over, attempt to defecate, and crouch down on a knee.

229. At 4:43 p.m., Officer Jason Rhoney with Officer Webb and a female detention officer handed another small Dixie cup with water to Mr. Stevens through the cell door. Mr. Stevens immediately drank the water and doubled over with severe abdominal pain.

### 2. Mr. Stevens' Condition Deteriorates During the Nightshift

230. Before the nightshift started, Sergeant Williams and Corporal Genwright were briefed about Mr. Stevens' behavior and condition during the dayshift. Sergeant Williams and Corporal Genwright shared this information with the nightshift officers, including Officer Parsons, Officer Bradley, and Officer Bryan Dame.

231. Sergeant Williams, Corporal Genwright, Officer Parsons, Officer Bradley, and Officer Dame were responsible for Mr. Stevens during the nightshift on April 21, 2020 and they observed and monitored his condition through the cell window and video monitor. No one entered Cell 206 and Mr. Stevens was not removed from the cell.

232. At 6:01 p.m., Sergeant Williams, Corporal Genwright and Officer Parsons went to the window of Cell 206. They saw that Mr. Stevens was naked and

45

still severely intoxicated on drugs. His condition had not improved during the dayshift.

233. Mr. Stevens was agitated, delusional, talking incoherently, disoriented, hyperactive, walking around the cell, sweating profusely, and breathing heavily with bizarre facial expressions. He was frequently doubled-over with abdominal pain and would walk through and stand in his diarrhea

234. At 6:44 p.m., Sergeant Williams and Officer Parsons gave Mr. Stevens a small orange plastic cup with water and a Styrofoam container with food through the tray opening. Mr. Stevens spilled most of the water from the cup, gulped the rest, and then doubled over with abdominal pain. He did not open the food container and he never ate any food.

235. Sergeant Williams placed a towel at the bottom of the cell door in the hall due to the spilled water and/or smell from Cell 206.

236. From 6:46 p.m. through 11:44 p.m., Mr. Stevens was observed and monitored by Sergeant Williams, Corporal Genwright, and Officer Parsons. Mr. Stevens was primarily lying and rolling around on the plastic mattress in the rear of the cell, moving constantly, breathing heavily, talking incoherently, and scratching or picking at his body with a crazed look on his face.[12] He was obviously hallucinating, delusional, and agitated.

---

[12] A person with severe methamphetamine intoxication may pick or scratch at his skin from a delusional feeling, called formication, that bugs are crawling on the skin.

237. When he was not lying down, Mr. Stevens had difficulty standing and walking and he was on his hands and knees, doubled-over on both knees, or crouched on a single knee.

238. At 11:44 p.m., Mr. Stevens was lying on the mattress, with his legs spread-eagled, bleeding from scratches on his inner right leg, talking to himself, and smiling bizarrely. When Sergeant Williams watched him through the cell window, Mr. Stevens shouted and pointed at her in a delusional manner, and she noticed that he was bleeding. At the request of Sergeant Williams, Officer Bradley and Corporal Genwright verified that Mr. Stevens was bleeding and they showed Officer Parsons as well.

239. At 12:06 a.m. on Wednesday, April 22, 2020, Mr. Stevens tore his rectum or scrotum while he was doubled-over and blood sprayed onto the cell floor. He quickly laid down on the mattress while talking incessantly and moving his head before he rolled onto his hands and knees in a fetal position.

240. After Mr. Stevens tore his rectum or scrotum, there was visible blood on the cell floor. Sergeant Williams, Corporal Genwright, Officer Bradley, and Officer Parsons were aware that he was bleeding in the cell and that his medical condition was worsening.

241. At 1:11 a.m., Sergeant Williams watched Mr. Stevens through the cell window. Mr. Stevens was lying on his back, out of his mind, talking incoherently, and yelling. She watched him for less than 30 seconds and walked away shaking her head.

47

242. A few minutes later, Mr. Stevens got onto his hands and knees in a fetal position, scratched his rectum or scrotum, and bled onto the mattress. He rolled onto the grated toilet hole with the plastic cup under his back, and screamed hysterically with blood present throughout his groin and rectal areas. Officer Bradley watched these events and notified Sergeant Williams about Mr. Stevens' condition.

243. Sergeant Williams knew or strongly suspected that Mr. Stevens had a serious medical need and she determined that a medical emergency existed.

### 3. IMS Medical Director Dr. Piland Does Not Assess Mr. Stevens' Medical Condition or Provide any Treatment, and His Condition Further Deteriorates

244. Sergeant Williams initially called the IMS nurse and the med-tech, but was unable to reach them.

245. At or around 1:20 a.m., Sergeant Williams called Dr. Piland at his home in Statesville "to see what we could do for Inmate Stevens." She told Dr. Piland "what was going on with Inmate Stevens," including the self-inflicted bleeding, yelling, and psychotic behavior.

246. In response, Dr. Piland told Sergeant Williams that Mr. Stevens would be fine and alright until the morning when the medical staff arrived.

247. Dr. Piland knew that medical staff was not present at the Detention Center during the nightshift and that the IMS nurse and med-tech did not arrive until around 8:00 a.m. Dr. Piland also knew that a physician, physician assistant, or nurse practitioner would not be present at the Detention Center.

248. Sergeant Williams either informed Dr. Piland about Mr. Stevens' medical condition, including severe drug intoxication, since he arrived at the

48

Detention Center 25 hours earlier or Sergeant Williams did not disclose all material information and Dr. Piland failed to properly question her about his condition.

249. Dr. Piland knew, strongly suspected, or reasonably should have known that Mr. Stevens had a serious medical need based on the information that he obtained or should have obtained from Sergeant Williams.

250. Despite his knowledge, Dr. Piland did not examine Mr. Stevens, review his medical records, confer with Nurse Beam, refer him for emergency medical services, or provide any medical treatment or care.

251. Dr. Piland acted in accordance with the Sheriff's policy definition of "emergency medical care" and the policy/custom of IMS when he made the decision to not examine or refer Mr. Stevens for emergency medical services.

252. During the remainder of the nightshift, Mr. Stevens was observed and monitored by Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, and Officer Dame, who was aware of Mr. Stevens' condition and behavior earlier in the shift. Mr. Stevens' condition deteriorated and did not improve or stabilize. He was psychotic, agitated, delusional, yelling, talking incoherently, struggling, sweating, breathing heavily, and scratching or picking at his skin while lying on the mattress, floor, or grated toilet hole. When he stood up, Mr. Stevens quickly doubled-over, collapsed to his hands and knees, or had to use the cell door or walls for support.

253. At 2:33 a.m., Officer Bradley placed a small red plastic cup with water into the tray opening with Sergeant Williams present. Mr. Stevens was yelling and

49

lying on the floor on the toilet hole grate. He rolled over to the door, grabbed the cup, and tried to take a sip of water while lying on his side. He then rolled onto his stomach on the diarrhea-stained floor and knocked over the cup spilling all of the water. He laid in this position for six minutes before rolling to his back and screaming at the top of his lungs.

254. Mr. Stevens was extremely dehydrated and he was experiencing rhabdomyolysis, acute renal failure, and altered mental status. He was too intoxicated, agitated, and psychotic to drink sufficient fluids and care for himself.

255. After this event, Mr. Stevens was not given any more water by the detention officers and they never recorded his fluid intake and output or collected his vital signs.

256. At 4:00 a.m., Mr. Stevens was lying on his back on the plastic mattress and he urinated, for the first time since his arrest, all over himself and the mattress. He was yelling, talking, panting, shaking and moving his hands, legs, and body, but he did not move out of the urine.

257. Mr. Stevens laid in his urine and exhibited the same behavior for over 2 hours through the end of the nightshift and into the dayshift. Officer Dame, Sergeant Williams, and Officer Parsons observed Mr. Stevens through the cell window on multiple occasions, but did not take any action to obtain medical treatment for him.

258. Before leaving the Detention Center at 6:05 a.m., Officer Bradley brought another detention officer to Cell 206. Officer Bradley was smiling and

50

chuckling about Mr. Stevens while he stood with the other officer and they looked into the cell.

259. Throughout the nightshift on April 21-22, 2020, Mr. Stevens' medical condition was so obvious that Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, and Officer Dame knew or strongly suspected that he had a serious medical need. They recognized that his medical condition was worsening during the nightshift and that he was experiencing a methamphetamine overdose.

260. In addition, after Sergeant Williams spoke with Dr. Piland, she and the other nightshift officers knew that Mr. Stevens' condition had continued to deteriorate, and did not improve or stabilize, and that Dr. Piland and the other health care providers employed by Institutional Medical Services were not providing, and would not provide, any treatment to Mr. Stevens before 8:00 in the morning.

261. Despite their knowledge, Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, and Officer Dame did not contact emergency medical services or another health care provider to obtain medical attention and treatment for Mr. Stevens during the remainder of the nightshift.

### 4. Mr. Stevens Is Yelling and Mutilating His Genitals Before He Goes into Cardiac Arrest and Dies

262. Before 6:00 a.m., Sergeant Williams and Corporal Genwright briefed Sergeant Sandra Laws and Corporal Elisha Perry about Mr. Stevens' behavior and condition during the nightshift. Sergeant Williams told Sergeant Laws to make sure medical staff looked at Mr. Stevens as soon as they arrived. Sergeant Laws and

Corporal Perry shared the information about Mr. Stevens with the dayshift officers, including Officer Brandi Eller.

263. Sergeant Laws, Corporal Perry, and Officer Eller were responsible for Mr. Stevens while he was present in Cell 206 during the dayshift on April 22, 2020 and they observed and monitored his condition through the cell window and video monitor.

264. At 6:02 a.m. and 6:12 a.m., Corporal Perry observed Mr. Stevens through the window of Cell 206. Mr. Stevens was lying naked on the mattress at the rear of the cell yelling, moving his arms around, and breathing heavily.

265. At 6:20 a.m., Mr. Stevens rolled off the mattress and began violently attacking his penis. During the next 95 minutes, Mr. Stevens was constantly yelling while mutilating his genitals with his hands and fists, the plastic cups in the cell, the cell door jamb edges, the wall, and by diving onto the floor. After striking or tearing at his genitals, he would double over or collapse onto the floor or mattress in pain, screaming, and panting heavily. He was extremely agitated and psychotic, and had obvious signs and symptoms of a methamphetamine overdose.

266. Corporal Perry saw him in this agitated and psychotic state at 6:31 a.m., and Officer Eller saw him in the same condition at 6:38, 6:46, 7:01, 7:17, and 7:32 a.m.

267. Corporal Perry described her observations as follows:

While performing rounds on my shift Inmate Stevens was moving all over the cell, at times he would be standing, and at other times he would be laying down and rolling around the floor. During this time, he was either hollering or mumbling under his breath. Inmate Stevens

52

appeared to be detoxing off of an unknown substance, and did appear to be trying to harm himself. He was seen messing with his penis from time to time. It looked like he was trying to pull the skin off, and it also appeared that he was bleeding from that area. … It appeared that Inmate Stevens was trying to damage his penis.

268. Corporal Perry or Officer Eller informed Sergeant Laws about Mr. Stevens' condition. She watched Stevens on the video monitor, checked on him in the cell, and spoke with Lieutenant Bailey.

269. Corporal Perry, Officer Eller, and Sergeant Laws knew or strongly suspected that Mr. Stevens had a serious medical need. They were aware that he was not receiving any medical treatment and that his condition had worsened since he was admitted to the Detention Center.

270. Despite their knowledge, Corporal Perry, Officer Eller, and Sergeant Laws did not contact a health care provider or emergency medical services to obtain medical attention and treatment for Mr. Stevens before 7:30 a.m.

271. Mr. Stevens consumed an insufficient amount of water, did not eat any food, did not sleep, and did not receive any medical treatment or monitoring while he was confined in Holding Cell 206.

272. At 7:30 a.m., Lieutenant Bailey observed Mr. Stevens through the cell window and saw him tearing at his penis. Lieutenant Bailey notified Captain Shook.

273. At or around 7:54 a.m., Captain Shook made the decision to place Mr. Stevens in a restraint chair and to bring him to the medical room.

274. At 7:57 a.m., various detention officers and deputy sheriffs dragged Mr. Stevens out of Cell 206, placed him in the restraint chair, and fully restrained him at Captain Shook's direction.

275. Mr. Stevens was covered in feces, urine, and blood, his skin was yellow, he was sweating profusely, his breathing was shallow, and he had contusions and abrasions throughout his body, arms, legs, genitals, and head. His penis was bleeding, bruised, and swollen, and he was groaning and convulsing as the officers fully restrained him. He was severely dehydrated, his kidneys were failing, and he was close to death.

276. Mr. Stevens was taken in the restraint chair to the medical room. When he was rolled away, one of the detention officers exclaimed, "motherfucker is crazy."

277. Med-Tech Avery attempted to take Mr. Stevens' vitals in the medical room. Mr. Stevens was unresponsive, his pulse was faint, and she was unable to obtain a blood pressure reading.

278. Captain Shook had asked Corporal Perry to call IMS Nurse Gregory Pope to come into the Detention Center and examine Mr. Stevens. When Captain Shook learned that Nurse Pope was 27 minutes away, he directed Corporal Perry to call Caldwell County EMS.

279. At 8:06 a.m., Caldwell County EMS was dispatched to the Detention Center and arrived five minutes later.

280. Captain Shook spoke with the EMTs when they arrived and gave them information about Mr. Stevens' medical condition and confinement. Sheriff Jones was present as well.

281. Upon information and belief, Captain Shook and Sheriff Jones knew about Mr. Stevens' medical condition and confinement in Cells 203 and 206, and they condoned the decisions by the detention officers to admit Mr. Stevens, to not complete a preliminary health screening, to use a restraint chair, and to hold him for detoxification without any medical treatment or monitoring.

282. At 8:15 a.m., Mr. Stevens went into cardiac arrest while the EMTs were attending to him outside of the medical room. At the request of the EMTs, Mr. Stevens was removed from the restraint chair and CPR was started. His heart was resuscitated and lost two times before Mr. Stevens was taken to Caldwell Memorial Hospital at 8:49 a.m.

283. Caldwell County EMS arrived at the Hospital at 8:53 a.m. and Mr. Stevens was brought into the Emergency Department. Mr. Stevens had no pulse, his blood glucose was 30 (critically low), and his body temperature was 104.2 degrees (hyperthermia).

284. At 9:15 a.m. on April 22, 2020, Mr. Stevens was pronounced dead by Dr. Tracy Parrish at Caldwell Memorial Hospital.

285. Mr. Stevens died from complications of dehydration due to methamphetamine toxicity.

286. If Defendants had obtained appropriate medical attention and treatment for Mr. Stevens before 7:30 a.m. on April 22, 2020, Mr. Stevens would be alive. His agitation would have been stabilized by a sedative medication and, if needed, an antipsychotic medication, and the medical staff would have administered IV fluids, performed lab tests and an ECG, and monitored his condition and recovery.

**FIRST CLAIM FOR RELIEF:**
**DELIBERATE INDIFFERENCE**
**TO SERIOUS MEDICAL NEEDS**
**BY INDIVIDUAL DEFENDANTS**

287. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

288. Ashley Stevens was a pretrial detainee while he was in the custody of the Caldwell County Sheriff's Office from April 21 through April 22, 2020.

289. As a pretrial detainee at the Caldwell County Detention Center, Mr. Stevens had substantive due process rights under the Fourteenth Amendment to be free from deliberate indifference to his serious medical needs. *See Gordon v. Kidd*, 971 F.2d 1087 (4th Cir. 1992).

290. At the time of his admission and throughout his detention at the Caldwell County Detention Center, Mr. Stevens was severely intoxicated from methamphetamine and experiencing a medical emergency. By the nightshift on April 21-22, 2020, it was clear that Mr. Stevens' condition was worsening and that he was experiencing a methamphetamine overdose with related health complications.

291. Severe methamphetamine intoxication or overdose is a serious medical need that can become a life-threatening condition and cause serious physical and mental harm if not properly treated.

292. Mr. Stevens' medical condition was so obvious that even a lay person would have easily recognized that he needed medical attention or treatment.

293. Mr. Stevens had serious medical needs while he was in the custody of the Caldwell County Detention Center.

## A. Booking and Admission – Defendants Williams and Genwright

294. Sergeant Williams and Corporal Genwright directly observed Mr. Stevens at 12:23 a.m. on April 21, 2020 and during the remainder of the nightshift.

295. Based on their observations, Sergeant Williams and Corporal Genwright recognized that Mr. Stevens was severely intoxicated on drugs and exhibiting significant signs and symptoms of methamphetamine use.

296. Sergeant Williams and Corporal Genwright were each aware or strongly suspected that Mr. Stevens had a serious medical need.

297. Sergeant Williams and Corporal Genwright knew that Mr. Stevens' medical condition required medical attention and that substantial risks of serious harm existed to Mr. Stevens if his condition was not treated.

298. Sergeant Williams and Corporal Genwright each purposefully failed to respond to Mr. Stevens' serious medical needs despite her/his actual knowledge of the

57

risks of harm or even though an objectively reasonable person under the circumstances would have appreciated the risks involved.[13]

299. On April 21, 2020, Sergeant Williams and Corporal Genwright consciously or recklessly disregarded the substantial risks of serious harm to Mr. Stevens by:

a. Admitting Mr. Stevens to the Caldwell County Detention Center;

b. Failing to contact the IMS medical staff, Caldwell County EMS, or any other health care providers;

c. Failing to complete a Preliminary Health Screening Form and an Officer's Statement of Providing Assistance [Intoxicated Person] Form;

d. Failing to obtain any medical treatment for him; and,

e. Confining him in a restraint chair with a spit mask for more than 5 hours in Holding Cell 203 without any medical care, food, and fluids, without being released from the chair to use the toilet or otherwise, and without collecting his vital signs.

300. Sergeant Williams and Corporal Genwright were acting under color of state law during their interactions with Mr. Stevens at the Caldwell County Detention Center.

301. Sergeant Williams and Corporal Genwright each acted with deliberate indifference to the serious medical needs of Mr. Stevens.

---

[13] In light of *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), "the Second, Seventh, and Ninth Circuits [have] adopted a completely objective standard for pretrial-detainee-medical-deliberate-indifference claims that requires showing that a reasonable officer would have recognized the serious medical condition and appreciated the excessive risk to the detainee's health." *Mays v. Sprinkle*, 992 F.3d 295, 301 n.4 (4th Cir. 2021) (*citing Darnell v. Pineiro,* 849 F.3d 17, 35 (2nd Cir. 2017); *Miranda v. County of Lake*, 900 F.3d 335, 353 (7th Cir. 2018); *Castro v. County of Los Angeles*, 733 F.3d 1060, 1071 (9th Cir. 2016) (en banc). Although the Fourth Circuit has not yet adopted the objective standard, it should be applied in this case.

302. Sergeant Williams and Corporal Genwright are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Stevens' substantive due process rights.

**B.      Defendant Elizabeth B. Beam, RN**

303. At around 7:50 a.m. on April 21, 2020, Nurse Beam arrived at the Detention Center and she was briefed about Mr. Stevens' medical condition, behavior, and confinement since 12:56 a.m. in a restraint chair in Holding Cell 203. Nurse Beam was also aware that a Preliminary Health Screening Form had not been completed for him.

304. Between 8:42 a.m. and 11:35 a.m., Nurse Beam saw Mr. Stevens in Holding Cell 203 for the purpose of providing nursing care. During this period, she was aware that he did not consume any fluids, eat any food, or sleep, and he was never released from the restraint chair to use the toilet or for any other reason.

305. Between 12:23 p.m. and 2:13 p.m., Nurse Beam saw Mr. Stevens through the window in Holding Cell 206 for the purpose of providing nursing care. During this period, she was aware that he did not consume any fluids, eat any food, or sleep.

306. When she left the Detention Center around 2:30 p.m., Nurse Beam knew that a physician or physician extender would not be present at the Detention Center to examine Mr. Stevens and that another RN would not be present until 8:00 a.m. on April 22, 2020, at the earliest.

307. Nurse Beam was aware or strongly suspected that Mr. Stevens had a serious medical need.

308. Nurse Beam knew that Mr. Stevens' medical condition required medical attention and that substantial risks of serious harm existed to Mr. Stevens if his condition was not treated.

309. Nurse Beam purposefully failed to respond to Mr. Stevens' serious medical needs despite her actual knowledge of the risks of harm or even though an objectively reasonable person under the circumstances would have appreciated the risks involved.

310. Nurse Beam consciously or recklessly disregarded the substantial risks of serious harm to Mr. Stevens by:

   a. Failing to assess his condition and prepare a plan of care;

   b. Failing to take his vital signs and monitor his fluid intake and output;

   c. Failing to medically monitor his detoxification from methamphetamine;

   d. Failing to complete a health screening;

   e. Failing to contact IMS Medical Director Dr. Piland, Caldwell County EMS, or another health care provider;

   f. Failing to obtain any medical treatment for him;

   g. Allowing Mr. Stevens to remain in a restraint chair for more than 11 hours without any medical care, food, and fluids, and without being released from the chair to use the toilet or otherwise;

   h. Failing to ensure that Mr. Stevens received medical care and monitoring after she left the Detention Center; and,

   i. Otherwise neglecting Mr. Stevens and failing to treat his medical condition.

60

311. The nursing care provided by Nurse Beam was a gross violation of the accepted standards of practice and so grossly incompetent and inadequate as to shock the conscience and be intolerable to fundamental fairness.

312. Nurse Beam was acting under color of state law when she provided nursing care to Mr. Stevens at the Caldwell County Detention Center.

313. Nurse Beam acted with deliberate indifference to the serious medical needs of Mr. Stevens.

314. Nurse Beam is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Stevens' substantive due process rights.

## B. Defendant John H. Piland, III

315. At or around 1:20 a.m. on April 22, 2020, Sergeant Vicky Williams called Dr. Piland at his home and notified him about Mr. Stevens' severe methamphetamine intoxication since he arrived at the Detention Center, including self-inflicted bleeding, yelling, and psychotic behavior.

316. Based on the information that he received from Sergeant Williams, Dr. Piland was aware or strongly suspected that Mr. Stevens had a serious medical need.

317. Dr. Piland knew that Mr. Stevens' medical condition required medical attention and that substantial risks of serious harm existed to Mr. Stevens if his condition was not treated.

318. Dr. Piland purposefully failed to respond to Mr. Stevens' serious medical needs despite his actual knowledge of the risks of harm or even though an objectively

reasonable person under the circumstances would have appreciated the risks involved.

319. Dr. Piland consciously or recklessly disregarded the substantial risks of serious harm to Mr. Stevens by:

    a. Failing to examine Mr. Stevens;

    b. Failing to review Mr. Stevens' medical records and to confer with Nurse Beam about his condition;

    c. Failing to refer Mr. Stevens for emergency medical services;

    d. Failing to provide any medical treatment or care for him;

    e. Improperly telling Sergeant Williams that Mr. Stevens would be fine and alright until the morning when the medical staff arrived; and,

    f. Otherwise neglecting Mr. Stevens and failing to treat his medical condition.

320. The medical care provided by Dr. Piland was a gross violation of the accepted standards of practice and so grossly incompetent and inadequate as to shock the conscience and be intolerable to fundamental fairness.

321. Dr. Piland was acting under color of state law when he communicated with Sergeant Williams about Mr. Stevens' medical condition at the Caldwell County Detention Center.

322. Dr. Piland acted with deliberate indifference to the serious medical needs of Mr. Stevens.

323. Dr. Piland is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Stevens' substantive due process rights.

**D. Nightshift on April 22, 2020 - Defendants Williams, Genwright, Bradley, Parsons, and Dame**

324. Before the nightshift began on April 21, 2020, Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, and Officer Dame were informed about Mr. Stevens's medical condition, behavior, and confinement during the dayshift.

325. Sergeant Williams, Corporal Genwright, Officer Bradley, and Officer Parsons directly observed Mr. Stevens in Holding Cell 206 before Sergeant Williams called Dr. Piland around 1:20 a.m., and they had also directly observed and interacted with Mr. Stevens during the prior nightshift.

326. After Sergeant Williams spoke with Dr. Piland, Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, and Officer Dame directly observed Mr. Stevens until the end of the nightshift at 6:00 a.m.

327. Based on their observations, Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, and Officer Dame recognized that Mr. Stevens' medical condition had deteriorated, and did not improve or stabilize, and that he needed emergency medical treatment.

328. Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, and Officer Dame were each aware or strongly suspected that Mr. Stevens had serious medical needs.

329. Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, and Officer Dame knew that Mr. Stevens' medical condition required

medical attention and that substantial risks of serious harm existed to Mr. Stevens if his condition was not treated.

330. Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, and Officer Dame each purposefully failed to respond to Mr. Stevens' serious medical needs despite her/his actual knowledge of the risks of harm or even though an objectively reasonable person under the circumstances would have appreciated the risks involved.

331. Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, and Officer Dame each consciously or recklessly disregarded the substantial risks of serious harm to Mr. Stevens by not contacting a health care provider or emergency medical services to provide medical attention and treatment for him after Sergeant Williams' call to Dr. Piland at 1:20 a.m. on April 22, 2020.

332. Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, and Officer Dame were acting under color of state law during their interactions with Mr. Stevens at the Caldwell County Detention Center.

333. Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, and Officer Dame each acted with deliberate indifference to the serious medical needs of Mr. Stevens.

334. Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, and Officer Dame are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Stevens' substantive due process rights.

64

**E.    Dayshift on April 22, 2020 – Defendants Laws, Perry, and Eller**

335.    Before the dayshift began on April 22, 2020, Sergeant Laws, Corporal Perry, and Officer Eller were informed about Mr. Stevens's medical condition, behavior, and confinement during the nightshift.

336.    Sergeant Laws, Corporal Perry, and Officer Eller directly observed Mr. Stevens in Holding Cell 206 between 6:00 a.m. and 7:30 a.m. on April 22.

337.    Based on their observations, Sergeant Laws, Corporal Perry, and Officer Eller recognized that Mr. Stevens' medical condition was continuing to deteriorate and that he needed emergency medical treatment.

338.    Sergeant Laws, Corporal Perry, and Officer Eller were each aware or strongly suspected that Mr. Stevens had serious medical needs.

339.    Sergeant Laws, Corporal Perry, and Officer Eller knew that Mr. Stevens' medical condition required medical attention and that substantial risks of serious harm existed to Mr. Stevens if his condition was not treated.

340.    Sergeant Laws, Corporal Perry, and Officer Eller each purposefully failed to respond to Mr. Stevens' serious medical needs despite her actual knowledge of the risks of harm or even though an objectively reasonable person under the circumstances would have appreciated the risks involved.

341.    Sergeant Laws, Corporal Perry, and Officer Eller each consciously or recklessly disregarded the substantial risks of serious harm to Mr. Stevens by not contacting a health care provider or emergency medical services to provide medical attention and treatment for him between 6:00 a.m. and 7:30 a.m. on April 22, 2020.

342. Sergeant Laws, Corporal Perry, and Officer Eller were acting under color of state law during their interactions with Mr. Stevens at the Caldwell County Detention Center.

343. Sergeant Laws, Corporal Perry, and Officer Eller each acted with deliberate indifference to the serious medical needs of Mr. Stevens.

344. Sergeant Laws, Corporal Perry, and Officer Eller are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Stevens' substantive due process rights.

## SECOND CLAIM FOR RELIEF:
### POLICY OR CUSTOM OF DELIBERATE INDIFFERENCE BY DEFENDANTS CALDWELL COUNTY, SHERIFF JONES, AND INSTITUTIONAL MEDICAL SERVICES

345. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

346. At the time of the events in this case, Caldwell County had an Agreement, dated July 1, 2011, with Institutional Medical Services to provide medical care to inmates at the Caldwell County Detention Center. Under the Agreement, IMS was only required to have the Medical Director, Dr. Piland, present once per week at the Detention Center.

347. In addition, Caldwell County had a Medical Plan for the Detention Center that was reviewed and approved in May 2015 in consultation with Sheriff Jones and Institutional Medical Services. The Medical Plan was set forth in the applicable policies and procedures in the SOP Manual at the Detention Center.

66

348. On and before April 22, 2020, Caldwell County, Sheriff Jones, and Institutional Medical Services knew that:

a. Individuals with severe drug intoxication, including methamphetamine, were regularly arrested and brought to the Caldwell County Detention Center for booking and admission;

b. Under Policy 2.03 of the SOP Manual, individuals with severe drug intoxication were not classified as inmates who may need "immediate medical care" and were admitted to the Detention Center instead of being sent to the Emergency Room at Caldwell Memorial Hospital;

c. IMS did not have any medical staff present at the Detention Center from 6:00 p.m. until 8:00 a.m. on weekdays and during the weekends;

d. The IMS Medical Director Dr. Piland was only available at the Detention Center once per week for sick call and lived nearly an hour away;

e. The Detention Center did not have sufficient medical staffing, supervision, and resources to medically treat and monitor an inmate with severe drug intoxication;

f. Detention officers were allowed to not complete a Preliminary Health Screening Form if an inmate was agitated, aggressive, violent, disruptive, or uncooperative during the booking process, contrary to Policy 2.11 and the Medical Plan;

g. "Emergency medical care" was defined in the Inmate Handbook as "a situation requiring immediate medical intervention due to an imminent life-threatening (life or death) situation, contrary to Policy 4.05 and the Medical Plan; and,

h. Inmates with severe drug intoxication were confined in holding cells at the Caldwell County Detention Center for extended periods of time without an adequate assessment or monitoring by a qualified medical provider and would only receive emergency medical care once an imminent life or death situation existed.

67

## A. Defendant Caldwell County

349. Caldwell County was aware that the Agreement with Institutional Medical Services provided inadequate medical care and medical supervision for the health and welfare of inmates, and that Policy 2.03 did not provide adequate emergency medical care to inmates with severe drug intoxication.

350. Caldwell County was also aware that the Sheriff's unofficial policy or custom on Preliminary Health Screening Forms and policy definition of "emergency medical care" were inconsistent with the requirements in the Medical Plan for the health screening of inmates and emergency medical care.

351. Caldwell County approved or condoned these policies or customs and did not have a Medical Plan that provided adequate medical care, medical supervision, and emergency medical services for inmates with severe drug intoxication at the Detention Center.

352. Through its approval of the policies or customs at the Detention Center, inadequate Medical Plan, and contractual relationship with Institutional Medical Services, Caldwell County had an official policy or custom of deliberate indifference to the serious medical needs of inmates, like Ashley Stevens, with severe drug intoxication.

353. Caldwell County's official policy or custom was a cause of, and the moving force behind, the violation of Mr. Stevens' right to be free from deliberate indifference to his serious medical needs.

68

354. Caldwell County is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policy or custom which caused Mr. Stevens' substantive due process rights to be violation at the Caldwell County Detention Center.

## B.   Defendant Sheriff Jones

355. Sheriff Jones approved Policy 2.03, the unwritten policy or custom on Preliminary Health Screening Forms, and the Inmate Handbook policy definition of "emergency medical care."

356. The Sheriff's official policies or customs were inadequate because they did not provide appropriate medical care to inmates with serious medical needs from severe drug intoxication.

357. In addition, on and before April 22, 2020, Sheriff Jones knew that:

   a. Due to the number of inmates with severe drug intoxication, in-service training was needed on detecting and handling medical and mental health emergencies from severe drug intoxication;

   b. No in-service training was provided to the detention officers on detecting and handling medical and mental health emergencies from severe drug intoxication;

   c. The decisions about whether to admit or obtain medical treatment for an inmate with severe drug intoxication during the nightshift were made by inadequately trained detention officers without any medical supervision or assistance;

   d. Detention officers were not completing a Preliminary Health Screening Form for inmates with severe drug intoxication who were agitated, aggressive, violent, disruptive, or uncooperative during the booking process, contrary to Policy 2.11;

   e. The Detention Center had a restraint chair for combative, self-destructive, or potentially violent inmates, contrary to Policies 7.11 and 7.09;

69

f. The SOP Manual did not have any policies or procedures for the use of a restraint chair and the Sheriff's Office did not provide any training to the detention officers on the use of a restraint chair for inmates with severe drug intoxication; and,

g. Detention officers used the restraint chair for extended periods of time to control an inmate's behavior, including agitation and/or psychosis from severe drug intoxication, without any limitations or requirements.

358. Sheriff Jones failed to provide adequate training to detention officers at the Caldwell County Detention Center on detecting, screening, and handling medical and mental health emergencies from severe drug intoxication.

359. Sheriff Jones also failed to provide adequate training to detention officers on the use of a restraint chair for inmates with severe drug intoxication.

360. Sheriff Jones knew that the detention officers would confront inmates with serious medical needs from severe drug intoxication and, without adequate training and policies, these inmates would frequently not receive proper medical attention and care in violation of their substantive due process rights.

361. Sheriff Jones' failure to provide adequate training to the detention officers showed a deliberate indifference to the rights of citizens, including Ashley Stevens.

362. Sheriff Jones had official policies and/or customs of deliberate indifference to the serious medical needs of inmates, like Mr. Stevens, with severe drug intoxication.

363. Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, Officer Dame, Sergeant Laws, Corporal Perry, and Officer Eller acted in

70

accordance with the Sheriff's policies or customs through their deliberate indifference to the serious medical needs of Mr. Stevens on April 21-22, 2020.

364. Sheriff Jones condoned the decisions by the detention officers to admit Mr. Stevens, to not complete a Preliminary Health Screening Form, to use a restraint chair, and to hold him for detoxification without any medical treatment or monitoring.

365. Sheriff Jones' official policies and/or customs were a cause of, and the moving force behind, the violation of Mr. Stevens' right to be free from deliberate indifference to his serious medical needs.

366. Sheriff Jones is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policies or customs which caused Mr. Stevens' substantive due process rights to be violated at the Caldwell County Detention Center.

## C.    Defendant Institutional Medical Services

367. Dr. Piland approved the Sheriff's Inmate Handbook policy definition of "emergency medical care" and Institutional Medical Services used the same inadequate policy or custom when determining if emergency medical services were needed for an inmate at the Detention Center.

368. Institutional Medical Services knew that the Sheriff's policy definition of "emergency medical care" did not comply with the Medical Plan and did not provide appropriate medical care to inmates with serious medical needs from severe drug intoxication.

71

369. Dr. Piland acted in accordance with this policy or custom when he made the decision to not examine or refer Mr. Stevens for emergency medical services on April 22, 2020.

370. In addition, on and before April 22, 2020, Institutional Medical Services failed to provide adequate medical staffing at the Caldwell County Detention Center, failed to provide adequate supervision of its nursing staff, and failed to provide adequate training for its nursing staff on medical and mental health emergencies from severe drug intoxication and the use of a restraint chair for inmates with severe drug intoxication.

371. Institutional Medical Services knew that the nursing staff and detention officers at the Detention Center would confront inmates with serious medical needs from severe drug intoxication, that the detention officers could use a restraint chair to control these inmates, and that, without adequate medical staffing, supervision, and training, these inmates would frequently not receive proper medical attention and care in violation of their substantive due process rights.

372. Institutional Medical Services' failure to provide adequate staffing, supervision, and training showed a deliberate indifference to the rights of citizens, including Ashley Stevens.

373. Institutional Medical Services had official policies or customs of deliberate indifference to the serious medical needs of inmates, like Mr. Stevens, with severe drug intoxication.

374. Nurse Beam and Dr. Piland acted in accordance with IMS' policy or custom through their deliberate indifference to the serious medical needs of Mr. Stevens.

375. Institutional Medical Services' official policies or customs were a cause of, and the moving force behind, the violation of Mr. Stevens' right to be free from deliberate indifference to his serious medical needs.

376. Institutional Medical Services is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the policies or customs which Mr. Stevens' substantive due process rights to be violated at the Caldwell County Detention Center.

**THIRD CLAIM FOR RELIEF:**
**ACTION ON OFFICIAL BOND AGAINST**
**DEFENDANTS SHERIFF JONES AND TRAVELERS**

377. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

378. On November 14, 2019, Sheriff Jones procured an official bond as principal from Travelers in the sum of $10,000 through December 6, 2020.

379. Travelers joined with Sheriff Jones as surety in the execution of the official bond and thereby undertook to be jointly and severally liable for the failure of Sheriff Jones and his detention officers to faithfully perform the duties of his office as Sheriff of Caldwell County.

380. Sheriff Jones' official bond was in full force and effect on April 21-22, 2020.

381. Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, Officer Dame, Sergeant Laws, Corporal Perry, and Officer Eller were acting

73

within the course and scope of their employment as Caldwell County detention officers and under color of Sheriff Jones' office during their interactions with Mr. Stevens on April 21-22, 2020.

382. The acts and omissions of Sergeant Williams, Corporal Genwright, Officer Bradley, Officer Parsons, Officer Dame, Sergeant Laws, Corporal Perry, and Officer Eller, as alleged in this action and imputed to Sheriff Jones under the doctrine of *Respondeat Superior*, constituted neglect, misconduct, misbehavior, and/or a breach of their official duties as detention officers.

383. Sheriff Jones and Travelers are jointly and severally liable to Plaintiff, pursuant to N.C. Gen. Stat. § 58-76-5, for Mr. Stevens's personal injuries and wrongful death to the extent of the official bond.

**FOURTH CLAIM FOR RELIEF:**
**MEDICAL MALPRACTICE BY**
**DEFENDANTS NURSE BEAM, DR. PILAND**
**AND INSTITUTIONAL MEDICAL SERVICES**

384. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

385. During her care of Ashley Stevens, Nurse Beam had a duty to use her best judgment, to use reasonable care and diligence in the application of her knowledge and skill to Mr. Stevens' care, and to provide health care in accordance with the standards of practice among registered nurses with similar training and experience in the same or similar communities.

386. During his care of Ashley Stevens, Dr. Piland had a duty to use his best judgment, to use reasonable care and diligence in the application of his knowledge

74

and skill to Mr. Stevens' care, and to provide health care in accordance with the standards of practice among family medicine physicians with similar training and experience in the same or similar communities.

387. At a minimum, Nurse Beam was negligent and breached her duty of care to Mr. Stevens by failing to use her best judgment, failing to use reasonable care and diligence in the application of her knowledge and skill to Mr. Stevens' care, and failing to provide health care in accordance with the standards of practice among licensed practical nurses with similar training and experience in the same or similar communities, including by:

   a. Failing to assess his condition and prepare a plan of care;

   b. Failing to take his vital signs and monitor his fluid intake and output;

   c. Failing to medically monitor his detoxification from methamphetamine use;

   d. Failing to complete a health screening;

   e. Failing to contact IMS Medical Director Dr. Piland, Caldwell County EMS, or another health care provider;

   f. Failing to obtain any medical treatment for him;

   g. Failing to recognize the signs and symptoms of severe methamphetamine intoxication and overdose;

   h. Allowing Mr. Stevens to remain in a restraint chair for more than 11 hours without any medical care, food, and fluids, and without being released from the chair to use the toilet or otherwise;

   i. Improperly delegating any nursing care tasks to Med-Tech Horton once she left the Detention Center;

   j. Failing to ensure that Mr. Stevens' condition was medically monitored after she left the Detention Center;

k. Failing to follow-up with the detention staff about Mr. Stevens' condition after she left the Detention Center; and,

l. In such further ways as may be shown by the evidence.

388. Nurse Beam was grossly negligent in her care of Mr. Stephens because her actions: (a) lacked even slight care, (b) showed indifference to the rights and welfare of his person, (c) were of an aggravated character, (d) were committed in reckless disregard for the rights and safety of Mr. Stevens, and (e) intentionally failed to comply with her duties as a licensed practical nurse.

389. Dr. Piland was negligent and breached his duty of care to Mr. Stevens by failing to use his best judgment, failing to use reasonable care and diligence in the application of his knowledge and skill to Mr. Stevens' care, and failing to provide health care in accordance with the standards of practice among family medicine physicians with similar training and experience in the same or similar communities, including by:

a. Failing to examine Mr. Stevens;

b. Failing to review his medical records and confer with Nurse Beam about his condition;

c. Failing to refer Mr. Stevens for emergency medical services;

d. Failing to provide any medical treatment or care for him;

e. Improperly telling Sergeant Williams that Mr. Stevens would be fine and alright until the morning when the medical staff arrived without conducting a medical examination;

f. Failing to recognize the signs and symptoms of severe methamphetamine intoxication and overdose;

76

g. Failing to properly question Sergeant Williams about Mr. Stevens' condition if she did not disclose all material information;

h. Failing to ensure that Mr. Stevens' condition was medically monitored;

i. Failing to follow-up with the detention staff about Mr. Stevens' condition after he spoke with Sergeant Williams;

j. Failing to properly supervise the care provided by Nurse Beam to Mr. Stevens; and,

k. In such further ways as may be shown by the evidence.

390. Dr. Piland was grossly negligent in his care of Mr. Stevens because his actions: (a) lacked even slight care, (b) showed indifference to the rights and welfare of his person, (c) were of an aggravated character, (d) were committed in reckless disregard for the rights and safety of Mr. Stevens, and (e) intentionally failed to comply with his duties as a physician and the Medical Director at Caldwell County Detention Center.

391. Nurse Beam was employed by Institutional Medical Services and acting within the course and scope of her employment when she provided nursing care to Mr. Stevens at the Caldwell County Detention Center.

392. Dr. Piland was employed by Institutional Medical Services and acting within the course and scope of his employment when he was consulted about medical care for Mr. Stevens at the Caldwell County Detention Center.

393. Institutional Medical Services is vicariously liable to Plaintiff, pursuant to the doctrine of *Respondeat Superior*, for the medical malpractice by Nurse Beam and Dr. Piland.

394. At the time of the events alleged herein, the arrangement or provision of health care services by Institutional Medical Services, Dr. Piland, and Nurse Beam, was not impacted, directly or indirectly, by (a) their decisions or activities in response to or as a result of the COVID-19 pandemic; or (b) by the decisions or activities, in response to or as a result of the COVID-19 pandemic, of a health care facility or entity where a health care provider provides health care services.

395. Institutional Medical Services, Dr. Piland, and Nurse Beam are not entitled to any immunity under N.C. Gen. Stat. § 90-21.133. Furthermore, this immunity does not apply to Plaintiff's claims for gross negligence.

**FIFTH CLAIM FOR RELIEF:**
**CORPORATE NEGLIGENCE AND**
**GROSS NEGLIGENCE BY DEFENDANT**
**INSTITUTIONAL MEDICAL SERVICES**

396. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

397. At all times relevant to this action, Institutional Medical Services had a duty to use reasonable care in performing its corporate policy, management, and/or administrative functions and decisions at the Caldwell County Detention Center.

398. At all times relevant to this action, Institutional Medical Services was aware that it needed adequate policies and training for its medical staff at Caldwell County Detention Center on emergency medical care, medical monitoring, and the use of a restraint chair for inmates with severe drug intoxication.

399. In addition, Institutional Medical Services was aware that Nurse Beam and the other RNs and med-techs were not fit to provide all of the nursing care at the

78

Caldwell County Detention Center because they lacked the necessary skills, training, and experience, and were inadequately supervised by the Medical Director or a physician extender.

400. Institutional Medical Services was negligent and breached its duty of care to Mr. Stevens by:

    a. Failing to have an adequate policy on emergency medical care for inmates with severe drug intoxication at the Detention Center;

    b. Failing to have proper policies on medical monitoring and the use of a restraint chair for inmates with severe drug intoxication;

    c. Failing to provide proper training for its nursing staff on emergency medical care, medical monitoring, and the use of a restraint chair for inmates with severe drug intoxication;

    d. Allowing all of the medical care for inmates with serious medical needs at the Detention Center to be provided by an RN without proper supervision by a physician or physician extender;

    e. Failing to provide any medical staff at the Detention Center from 6:00 p.m. until 8:00 a.m. on the weekdays;

    f. Failing to have a physician or physician extender present at the Detention Center more than one time per week;

    g. Failing to properly monitor and supervise the performance of Nurse Beam;

    h. Failing to hire a physician or physician extender in or near Lenoir to assist Dr. Piland with the medical program at the Detention Center; and,

    i. Failing to have proper policies, staffing, and/or supervision at the Detention Center to provide appropriate medical care for inmates with serious medical needs from severe drug intoxication;

    j. In such further ways as may be shown by the evidence.

401. Institutional Medical Services was grossly negligent in performing its corporate administrative duties due to its willful or wanton conduct.

402. Institutional Medical Services intentionally failed to carry out its duties imposed by law or contract which were necessary to protect the safety of inmates at the Detention Center, and acted in conscious and intentional or reckless disregard for the rights and safety of others, including Ashley Stevens.

## DAMAGES

403. As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, negligence, and gross negligence, Ashley Stevens suffered severe personal injuries throughout his pretrial detention at the Caldwell County Detention Center from the deterioration of his medical and mental health, including psychosis, severe agitation, altered mental status, dehydration, rhabdomyolysis, acute rental failure, hyperthermia, bleeding, and abrasions and contusions throughout his body, arms, legs, genitals, and head.

404. Due to his personal injuries. Mr. Stevens experienced physical pain, mental suffering, and mental anguish.

405. Mr. Stevens also experienced disability, handicap, inconvenience, and hardship from the loss of use of his body and mind due to his physical injuries and the deterioration of his medical and mental condition.

406. Plaintiff, as the Administrator of the Estate of Ashley Hurl Stevens, is entitled to recover compensatory damages from Defendants, jointly and severally, for Mr. Stevens' personal injuries under N.C. Gen. Stat. § 28A-18-1.

80

407. As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, negligence, and gross negligence, Mr. Stevens died on April 22, 2020.

408. Mr. Stevens would be alive if Defendants had obtained appropriate medical attention and treatment for his serious medical needs.

409. Mr. Stevens was 42 years old at the time of his death.

410. Mr. Stevens was survived by his legitimated daughters, Madeline Loraine Paszek-Lowman and Myra Paszek, who are his sole heirs under the North Carolina Intestate Succession Act, N.C. Gen. Stat. § 29-1, *et seq.*

411. As a direct and proximate result of Defendants' deliberate indifference, medical malpractice, negligence and gross negligence, Plaintiff, as the Administrator of the Estate of Ashley Hurl Stevens, is entitled to recover the following damages under N.C. Gen. Stat. § 28A-18-2(b):

    a. Compensation for the pain and suffering of Mr. Stevens;

    b. The reasonable funeral expenses of Mr. Stevens;

    c. The present monetary value of Mr. Stevens to his daughters of the reasonably expected:

        i. Services, protection, care, and assistance of Mr. Stevens, whether voluntary or obligatory, to his daughters; and,

        ii. Society, companionship, comfort, guidance, kindly offices, and advice of Mr. Stevens to his daughters.

412. Plaintiff, as the Administrator of the Estate of Ashley Hurl Stevens, is entitled to recover compensatory damages from Defendants, jointly and severally, for Mr. Stevens' wrongful death under N.C. Gen. Stat. § 28A-18-2.

81

413. The acts of deliberate indifference to Mr. Stevens' serious medical needs by Defendants Williams, Genwright, Bradley, Dame, Laws, Perry, Eller, Institutional Medical Services, Dr. Piland, and Nurse Beam were done with reckless or callous indifference to Mr. Stevens' civil rights. Plaintiff is entitled to recover punitive damages from these Defendants under 42 U.S.C. § 1983.

414. The acts of medical malpractice by Nurse Beam and Dr. Piland, as alleged above, were done with conscious and intentional disregard of and indifference to the rights and safety of others, including Mr. Stevens, which each of them knew or should have known was reasonably likely to result in injury, damage, or other harm, including death.

415. The medical malpractice committed by Nurse Beam and Dr. Piland was willful or wanton conduct as defined in N.C. Gen. Stat. § 1D-5.

416. The acts of corporate negligence and gross negligence by Institutional Medical Services, as alleged above, were done with conscious and intentional disregard of and indifference to the rights and safety of others, including Mr. Stevens, which Institutional Medical Services knew or should have known was reasonably likely to result in injury, damage, or other harm, including death.

417. Upon information and belief, Institutional Medical Services intentionally provided inadequate staffing, monitoring, and supervision at the Detention Center which placed inmates at risk of serious injury or death in order to increase profits.

418. The corporate negligence and gross negligence committed by Institutional Medical Services was willful or wanton conduct as defined in N.C. Gen. Stat. § 1D-5.

419. Dr. Piland, an officer and manager of IMS, participated in and/or condoned the willful or wanton conduct by Institutional Medical Services.

420. Plaintiff is entitled to recover punitive damages from Defendants Nurse Beam, Dr. Piland, and Institutional Medical Services under N.C. Gen. Stat. § 1D-15.

421. Plaintiff is also entitled to recover reasonable attorneys' fees and litigation expenses from Defendants (excluding Travelers) pursuant to 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays the Court for the following relief:

1. Compensatory damages from Defendants, jointly and severally, for Mr. Stevens' personal injuries and wrongful death;

2. Punitive damages from Defendants Williams, Genwright, Bradley, Dame, Laws, Perry, Eller, Institutional Medical Services, Piland, and Beam under 42 U.S.C. § 1983;

3. Punitive damages from Defendants Institutional Medical Services, Piland, and Beam under N.C. Gen. Stat. § 1D-15;

4. Reasonable attorney's fees and litigation expenses from Defendants (excluding Travelers) under 42 U.S.C. § 1988;

5. Costs of court and interest as allowed by law;

83

6.     A trial by jury on all disputed issues of fact; and,

7.     Such other and further relief as the Court may deem just and proper.

This the 18th day of April, 2022.

/s/ Carlos E. Mahoney
Carlos E. Mahoney
Glenn, Mills, Fisher & Mahoney, P.A.
P.O. Drawer 3865
Durham, NC 27702-3865
Telephone: 919-683-2135
Facsimile: 919-688-9339
cmahoney@gmfm-law.com
N.C. State Bar No. 26509
Counsel for Plaintiff